PARK v. MOORMAN MFG. CO. et al.

No. 7456. Decided March 14, 1952. (241 P. 2d 914.)

See 3 C. J. S., Agency, sec. 328. Warranty of fitness for particular purposes. 46 Am. Jur., Sales, sec. 346; 34 A. L. R. 540.

*McKay, Burton, Nielsen & Richards, David L. McKay, George M. McMillan,* Salt Lake City for appellant.

*Lothaire R. Rich, Brigitte M. Bodenheimer,* Salt Lake City, for respondent.

McDONOUGH, Justice.

Respondent is a poutlryman who raises chickens principally for their egg production. His plant is divided by a highway known as Redwood Road which causes about half of his coops to lie on the east side of the highway and the other half to lie on the west side of the highway. At the time of respondent's transactions with appellant, respondent had approximately 3,500 hens on the west side of the road and about 2,850 hens on the east side. These chickens were being fed a product known as "Larro" under a feeding plan known as the "Mash" method.

Appellant is a mid-western feed company which manufactures and sells a poultry feed concentrate known as "Poultry Mintrate 40" hereinafter called "Mintrate." This product is sold under a direct sales method in which salesmen supplied with samples and literature call upon prospective customers. One of these salesmen, Gail Barron, called upon respondent for the purpose of inducing him to use Mintrate. Respondent was given a circular published by appellant which was headed "Instructions for Feeding" and "New, Easy, No Mix, Self-Feed Concentrate," and "How to use the Easy, No Mix, Self-Feed Way new feeding method for hens—no grinding or mixing." This circular gave three instructions on the "cafeteria" method of feeding hens and then gave a question and answer:

"Question: Which Feeding Method Should I Use?

"Answer: That depends on You. When not set up for grinding and mixing, the self-feed way described above may be preferred. It has been successfully used by thousands of Moorman Customers."

Barron repeated statements made in this circular to respondent and urged him to try this feed and self-feeding system instead of his old feed and system. On successive visits Barron told respondent that various tests had been made with Mintrate and the self-feed method and that it was equal or superior to any feeding method then in use;

that no less than 65% egg production had been achieved, and even 90% had resulted in one instance; that a minimum egg yield of 65% could be expected on Mintrate and self-feed plan, and that under this product and plan the hens would not moult for 15 months; that great time and effort would be saved under the self-feed plan; and that it would be less expensive than the plan then being used by respondent. Some of these statements were made in the presence of one McArthur who was appellant's district sales manager. Barron testified that he had no personal knowledge of the truth of these statements, but that they had been made in various sales meetings and were good selling points.

Respondent agreed to try appellant's product and the self-feeding plan on 1,250 hens, but he desired some assurance that comparatively he would not lose any more than he would under his present feed and plan. Finally respondent agreed to put all the hens on the east side of the highway on appellant's plan and compare them with the hens on the west side of the road providing appellant would give him a guarantee. Barron contacted McArthur, who in turn contacted McCullough, the state manager, and Barron was told that he could guarantee the product; that the company would equal the production of any competitive feed on the self-feed method. On the assurance that a guarantee was forthcoming respondent put the east side chickens on the appellant's feed and program. Some time later an instrument was executed by Barron which read:

"It is agreed that the [sic] LaVar Park feeds approximately 2,850 laying hens in accordance with the 'self-feed' sponsored by the Moorman Manufacturing Company. It is further agreed that in the event of these birds failing to produce an equal amount of eggs for the same food costs as his other hens, now on a different method of feeding, the Moorman Manufacturing Company will reimburse Mr. Park the entire amount of the money difference. * * * In the event that the illness is caused by the feeding program, the Moorman Manufacturing Company will reimburse Mr. Park for his loss. In the

event of illness by some other cause the Moorman Manufacturing Company will not be responsbile.

"/s/ Gail Barron
"Moorman Manufacturing Co.
"Representative."

The execution of this instrument, which was designated as Exhibit "C," was unknown to McArthur, McCullough, or any of the company officials until after respondent's trouble commenced.

For the first two weeks under appellant's feed and plan, Park was satisfied with the results. Then the egg production of the east side birds dropped, the hens became thinner and an unusual amount of picking and cannibalism developed. Barron requested the company to check into the cause of respondent's difficulty and the company sent a service department official and a company veterinarian to investigate. The veterinarian examined two birds and found no disease, but stated in effect that there was malnutrition due to overeating of oats.

There had been no more than the ordinary percentage of losses in the west side birds who were of the same age and from the same hatchery as the east side birds. There were no harmful substances in the Mintrate and the Mintrate contained all the substances purportedly contained in it. Plaintiff's main objection was that he had fed the hens in accordance with defendant's instructions and the death and loss of production in the east side chickens was the result of the "self-feeding system."

The trial court admitted Exhibit "C," the "written guarantee" for the limited purpose of showing the probability of the representations purportedly made by defendant's agent and hence the case was not submitted to the jury on the theory of a written warranty. The case was submitted, however, on the theory of express warranties and upon the theory of a breach of implied warranty as to fitness of the product and the method for plaintiff's pur-

poses. The jury returned a verdict for the plaintiff. Defendant appeals.

Appellant's first contention is that the trial court erred in submitting the case to the jury upon the theory of express warranty. Appellant's position is that no statement of fact was made which constituted an express warranty; that respondent did not rely on any oral representations; and that the alleged statement of fact submitted to the jury as a warranty was not proved to be untrue when made. There is no merit to this contention.

Section 81-1-12, U. C. A. 1943, defines an express warranty as follows:

"Any affirmation of fact or any promise by the seller relating to the goods is an express warranty, if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only, shall be considered as a warranty."

It is evident that many of the statements made by Barron were matters of puffing or sales talk and not statements of "fact" or "promise" as contemplated by section 81-1-12, U. C. A. 1943. This is not, however, true of the statement as to the experienced and promised 65% production. As we stated in *Nielsen* v. *Hermansen*, 109 U. 180, 166 P. 2d 536, 537:

"This statute and the decisions of this court make it clear that an affirmation of fact, that is a representation, is a warranty and not merely evidence of a warranty, if its natural tendency is to induce the buyer to purchase the goods and the buyer thus induced does purchase them."

Further, in the same case we said:

"Where it appears doubtful whether or not the statement is one of fact or opinion, and therefore whether there is a warranty, the question should be left to the trier of the facts."

The testimony in this case is to the representation relative to 65% production of eggs was testified to  by several witnesses. The various recollections of these witnesses were:

"the feed had been tried numerous times and it had never had less than 65% egg yield;" "the chickens using it would produce not less than 65%;" "they would never lay below 65% and that there had been better results than that;" "it will make your chicken lay 65% or more."

Every one of these witnesses, although they phrased the statement in a different manner, expressed it as a statement of fact, indicating that it was so made as a statement of fact or at least as a promise sufficient to fall under sec. 81-1-12, U. C. A. 1943, if it did in fact induce the purchase by the respondent. Further, we must recognize that the percentage of production is a very real and important fact to be considered by one in the egg producing business. The percentage of production is a figure watched with much interest and care by poultrymen much as is a production output of a factory or the yield of bonds. In addition there is evidence that Barron made explicit statements relating directly to the production to be expected, the natural tendency of which did induce the plaintiff to purchase the product despite respondent's desire to obtain a written "guarantee" and not merely "talk." The fact that he desired and requested a written "guarantee" is not sufficient to take the question of his inducement to buy or his reliance or non-reliance on any oral representations from the jury. Furthermore, it is not necessary—though, here, there is evidence from which the jury might so infer—that the statement of fact was untrue when made as contended by appellant. Section 81-1-12, U. C. A. 1943, expressly makes the affirmation of fact or promise a warranty where the natural tendency of the affirmation or promise is to induce the purchase and the purchase is made in reliance thereon. The evidence in this case is substantial and supports the essential elements which the plaintiff was required to

prove, and if believed, is sufficient to support a verdict for the plaintiff. Hence, the question of expreses warranty was properly submitted to the jury.

Appellant's second contention is that the court erred in permitting the jury to find either (a) that Barron had express or implied authority to make any warranty whatsoever concerning defendant's feed, or (b) that Moorman Manufacturing Company ratified any statement or warranty made by Barron, or (c) that Moorman Manufacturing Company was estopped to deny the authority of Barron to make any statement or warranty. The real question under this contention is not as to the authority of Barron to warrant, but as to his authority to make the statements which were made; the question as to whether the statements were warranties being, under proper instruction, a question for the jury. The record supports the finding that the right of defendant's agents to warrant was neither expressly given nor withheld, and further, that it was not the usual and customary practice of the feed business to give warranties in respect to feed sold. The fact that such warranties are not usually or customarily given, however, while of evidentiary value, is not conclusive. There is distinction between express authority to give warranties or to have warranties inferred, and the authority to make statements which may later be interpreted as warranties. We believe this case falls in the latter category. The record supports a finding that Barron's authority to make the statements was derived from McCullough—both through the direction given in sales meetings, and through his communication with McCullough through McArthur when plaintiff asked that he be given some guarantee. Hence, if McCullough had the authority to make the statements made by Barron, then Barron likewise had the right and would bind the defendant. Here McCullough was a general sales agent of the defendant company who had in charge the states of Utah, Idaho, and part of Nevada. His job was to hire, train, and

develop salesmen for defendant's products and to sell those products in these states. It was acknowledged that there was a great deal of business in Utah not yet obtained by defendant and that they were "out to get this business." It is also evident that in order to get this business, McCullough had the authority common to all general managers to perform collateral acts which were incidental to this responsibility. As stated in Mecham on Agency, Section 1781:

"Wherever the doing of a certain act or the transaction of a given affair or the performance of certain business is confided to an agent, the authority to so act will, in accordance with a general rule often referred to, carry with it by implication the authority to do all of the collateral acts which are the natural and ordinary incidents of the main acts or business authorized. The speaking of words,—the making of statements, representations, declarations, admission, and the like,—may easily be such an incident as the doing of any other sort of act."

Further,

"Since the authority for the doing of these incidental acts, however, springs from the authority to do the main act it must ordinarily end with it. The incidental thing must be a part of the main thing. It must occur before the main act is completely ended: it must take place while that is still going on."

In this case, McCullough's main authority was to sell the product and to train salesman to sell it. In order to do this, certain statements were required to be made. Such statements sprang from the main authorization and, in this case, were a part of the main act; occurring before the main act of selling plaintiff was ended and in fact made while carrying out the main job of selling to plaintiff.

Mecham on Agency, Section 183, states certain limitations on this rule:

"The statements are admissible because it is deemed that the principle, in authorizing the act, has authorized also the statements which are the usual and natural concomitants and incidents of the doing of

the act itself. In order, therefor, to bind the principal by statements or admissions under the rule here in question, it is essential—(1) That the making of statements or admissions of the class of those in question can fairly be regarded as incident to the act authorized to be done. If there was no occasion to say anything, or anything of the sort in question, there can be no foundation for their admissibility. (2) They must be made by an agent authorized to act with reference to the subject matter * * *. (3) The statements, representations or admissions must have some inherent and rational relation to the subject matter of his agency * * *. (4) And the statements, representations or admissions must have been made by the agent at the time of the transaction, and either while he was actually engaged in the performance, or so soon after as to be in reality a part of the transaction."

The statements and representations in this case fill the requirements and do not transgress any of the above limitations. As Mecham further states in Section 1785:

"The question whether a given act or fact is part of or incident to another act or fact is obviously one which is often extremely difficult to determine. What was the main act, when did it begin, when did it end, must first be decided; then: was this representation or statement or admission a natural and ordinary part of it? * * * The question, like other questions of implied or incidental authority, is usually a question of fact."

We feel that there was no error in submitting these statements to the jury to determine whether there was authority for the statements to be made and then to determine whether such statements constituted an express warranty as noted above.

Since the question as to authority was properly submitted to the jury, there is no need to consider the further questions raised by appellant as to ratification by or estoppel of defendant.

The third error assigned by appellant is that the court erred in holding defendant liable on the theory of breach of express and implied warranties as to the method of feed-

ing as distinguished from the feed itself. The trial court, in its instructions, failed to distinguish between the feed itself and the method by which the feed was to be fed. Instead, the court instructed that if the jury found plaintiff had used the feed and had followed the plan outlined to him and had suffered a loss due to the feed or the plan, then if they decided there had been a breach of warranty, they were to find for the plaintiff. There is no error in this instruction. It is true that normally one may be liable on a suggested method—but on a different theory than that upon which one may be liable for the sale of a chattel. It is also true that the Uniform Sales Act, Title 81, U. C. A. 1943, is applicable only to goods and chattels. In this case, however, the plaintiff was not sold two separate items—a good *and* a method—but was sold a good to be used in a particular manner. The method was the basis upon which the good was sold. The good was represented to produce certain results if used in a particular manner. The feed was a suitable feed and contained no deleterious substances, yet it was to be used in the manner suggested to make the representations applicable. The feed and method were not to be separated in this transaction, but were integrating items which, if used as directed, were to produce certain results. This affirmation induced the sale and was an integrated part of the sale. Hence, there was no error in the court's refusal to submit the case upon a different theory for the method and for the feed.

Appellant further contends that the evidence in this case is insufficient to justify the inference that plaintiff's loss was the proximate result of the use of either the feed or the method of feeding or both. The record contains testimony of defendant's own veterinarian that the feed or plan could have caused plaintiff's loss. There was further testimony of other witnesses who had used the feed and had had undesirable results. The inferences drawn by officers of defendant company and by buyers from plaintiff that the chickens on defendant's feed

and plan were far below the other chickens on the other plan, and that such condition came within a significant period after defendant's feed and plan were adopted is further evidence of proximate cause. This question of proximate cause is likewise a jury question. Taking the evidence most favorable to the plaintiff, there is substantial evidence established by the record to support the jury's implied finding as to proximate cause of the loss.

Objection is also made to the admission of Exhibit "C" for the limited purpose of showing whether or not some oral conversations pertaining to those matters had taken place between Barron and plaintiff. Appellant contends that the admission of the exhibit constituted prejudicial error as it tended to emphasize the idea that plaintiff should recover on one theory or another. We think the court's instruction plainly explained to the jury the purpose for which the exhibit was admitted and that it was not to be considered for any other purpose and that under such instruction no error resulted which was prejudicial to defendants.

The final contention of appellant is that the court erred in its theory of damages. The fundamental principle of damages is to restore the injured party to the position he would have been in had it not been for the wrong of the other party. In this case, both parties cite and rely somewhat on the case of *S. A. Gerrard Co.* v. *Fricker*, 42 Ariz. 503, 27 P. 2d 678, 680 in which colonies of bees were destroyed by poison. The court there said:

"We think the rule must be the one ordinarily applied for the destruction of or injury to personal property in general. This rule we find is: 'Definite rules which will measure the extent of recovery in all cases even of a particular class are difficult to formulate owing to the consideration which must be given in each case to its specific and perhaps peculiar surrounding circumstances. Stated in broad terms, however, the measure of damages is such sum as will compensate the person injured for the loss sustained, with the least burden to the wrongdoer consistent with the idea of fair compensation, and with the duty upon the person injured to exercise reasonable care to

mitigate the injury, according to the opportunities that may fairly be or appear to be within his reach. * * *' 17 C. J. 844, § 166."

This court further stated:

"We think the true measure of damages as applied to the facts is the difference between the market value of the colonies at the time they were damaged and their value after they were rebuilt, together with the reasonable expenses incurred by plaintiff in an effort to mitigate or keep down the loss as much as possible."

We are in accord with the general proposition that where property is destroyed the true measure of damages is the difference between the market value of that property immediately before the destruction and its replacement cost, plus its use value until it can be replaced within the time required of a prudent plaintiff in exercise of his duty to mitigate damages, less any salvage value of the destroyed property. This replacement cost rule has been applied in many cases of injury to personal and real property by this court. *Bergstrom* v. *Mellen*, 57 Utah 42, 192 P. 679; *Metcalf* v. *Mellen*, 57 Utah 44, 192 P. 676, citing *Gilwee* v. *Pabst Brewing Co.*, 195 Mo. App. 487, 193 S. W. 886; *Marks* v. *Culmer*, 6 Utah 419, 24 P. 528; *Egelhoff* v. *Ogden City*, 71 Utah 511, 267 P. 1011.

A problem arises, however, where as in this case there is no market value of the property destroyed, since laying hens above the age of five months are not generally available, and a market value must be arrived at by a process of computation. Hence, in order to determine the value of the plaintiff's loss, we must start from a base and compute the incidentals which would be included in a market price of the destroyed object if it had been obtainable on the open market. Since there was some evidence that five-month pullets were sometimes available on the market, the price of these pullets was used as a starting base even though plaintiff's chickens were somewhat older than this when

the loss occurred. In respect to the computation of damages the trial court instructed:

"In determining the amount of such damages plaintiff is entitled to compensation for an amount that will correspond to the market value of the chickens which died and which were culled at the time and place of the death and culling thereof, or a reasonable time thereafter, less the amount received by the plaintiff for the sale of the culls.

"You are instructed that if you find from the evidence that laying hens over the age of five months could not be purchased, then there would be no readily ascertainable market value, and in lieu thereof plaintiff would be entitled to the market price of five-month old pullets, plus overhead costs until the pullets were mature, and less the value of the egg yield during the said interval, and you must also consider the fact that in such an event plaintiff would have younger birds than those lost, and you must deduct the net profit that would accrue to the plaintiff from the difference in the age of the birds lost and those with which they could be replaced. In determining the amount of damages you are instructed that plaintiff is entitled to the value of the eggs less the cost of producing the same, that the dead hens and culls would have laid from the time of damage to each hen until plaintiff could replace it, acting with the speed and diligence of an ordinary prudent poultryman."

This instruction, although cumbersome, is not in error. The first paragraph of the instruction properly states that plaintiff is entitled to damages in the amount of the market value of the chickens destroyed. The second paragraph then provides a formula by which the market value of value of suitable replacements may be determined. Appellant's objection to the last sentence of the second paragraph is that it awards a loss of profits from the dead chickens in addition to the loss of the chickens, and that this loss of profit is acutally provided for in the market price of the replacements. This sentence does not so instruct. It merely expresses what damages are to be determined for the period in which there was a loss of use before the replacements could prudently be obtained by plaintiff. So construed, this instruction properly expresses the law in regard to damages. See cases cited above.

Damages in each case must be computed with respect to the particular circumstances involved. In this case we conclude that the evidence with reference to loss of plaintiff was, of necessity, based upon a comparison with the chickens on the west side of the road. We believe the record shows such evidence is substantially definite and complete to establish the damages sustained by the plaintiff. The judgment is affirmed. Costs to the respondent.

WOLFE, C. J., and WADE and CROCKETT, JJ., concur.

HENRIOD, J., did not participate.