321 P.2d 926

**FARMERS GRAIN COOPERATIVE,**
*Plaintiff and Appellant,*

v.

**Earl FREDRICKSON, Defendant and Respondent.**

No. 8701.

Supreme Court of Utah.

Feb. 21, 1958.

Bullen & Olson, Logan, Howell, Stine & Olmstead, Ogden, for appellant.

Huggins & Huggins, Newel G. Daines, Logan, for respondent.

WORTHEN, Justice.

Appeal from a judgment entered on the jury's verdict awarding defendant damages for breach of warranty and negligence with respect to nutritional deficiencies in turkey feed furnished defendant by plaintiff.

Defendant in 1953 contracted with plaintiff to raise 5,000 turkeys on its feed. He executed a note and mortgage on the birds to secure the advances of feed. The mortgage required defendant to purchase from plaintiff all feed required by the mortgagor for the feeding of said turkeys.

Defendant received the turkeys from H. J. Bonie Company of Ogden. The birds were brooded at Trenton, Utah by Jay Hodges, and were delivered in two batches, 3,920 on April 11, and 1,120 on April 14.

A short time after delivery, defendant began incurring abnormal death losses in the flock. The birds at that time were being fed on Farmers Grain Crumbles. One Grant Leonard, the plaintiff's salesman, who made the deal with defendant was

contacted as was Amie Bonie, the turkey salesman. Leonard suggested the introduction of terramycin into the drinking water. On April 22, 1953, six of the poults were sent to Utah State University for examination, diagnosis and recommendation. Dr. Miner, head of the Department of Veterinary Science at the University, was of the opinion that the poults were suffering from a Vitamin B deficiency, and recommended the use of milk products. Notwithstanding the recommendation of Dr. Miner, Leonard instructed defendant to keep the birds on terramycin. They were kept on the drug for another eight days before they were put on a milk diet. The birds continued dying but a short time after they were put on a milk diet the death rate subsided. Seven hundred and twelve birds were lost in the brooder house. At about five weeks of age the birds were moved to colony houses from the brooder. No unusual losses were sustained in the colony houses.

From the time the birds were moved onto the range until processing, defendant lost another 395 birds. No analysis was made of any of the birds after they went onto the range. No analysis was ever made at any time of any of the feed.

The project did not pay out. Plaintiff brought an action to foreclose on the note and mortgage. Defendant counterclaimed alleging breach of warranty and negligence with respect to nutritional deficiencies in

the feed. Defendant claimed damages as follows: (1) $3,600 for the poults that died, (2) $4,102.92 for loss of weight on the birds that did not die, (3) $5,309.76 for extra feed required to bring the birds to maturity.

The case was tried to a jury; a special verdict with interrogatories was submitted upon which it returned in defendant's favor on his counterclaim as follows:

| Item one for loss of poults | $3,500.00 |
| Item two for loss of weight of other birds | 3,779.00 |
| Item three expended for extra feed | 5,039.76 |

The jury found for plaintiff on its note and mortgage a balance for feed in the sum of $5,309.33.

The first item for loss of poults was reduced from $3,500 to $1,698, and judgment was entered by the court in favor of defendant for $10,516.76 on his counterclaim and in favor of plaintiff on its note and mortgage for $5,309.33.

Plaintiff assigns error as follows:

I. Insufficiency of the evidence to justify the inference that the feed was deficient and that such deficiency proximately caused defendant's damage.

II. That the court erred in permitting defendant to inquire about insurance carried by plaintiff against defendant's losses.

■ We are unable to agree with appellant as to his first assignment of error. Rather we are of the opinion that the evi-

dence was sufficient to justify the inference that the feed was deficient and that such deficiency proximately caused defendant's damage.

Testimony was given by all other turkey growers who received poults from the same two hatches involved as well as from the supplier of the poults. All of the other turkey growers testified that their poults were in good condition upon delivery; all testified as to the conditions under which their poults were brooded; their mortalities, none of which were exorbitant and were much lower than defendant's; all testified as to their weights at processing, which were considered within the range of normal weights. None of the other growers used plaintiff's feed.

Amie Bonie, the poult salesman, testified that he was an expert in selling and servicing including brooding and ranging. He testified that all of the turkeys including defendant's were in good condition when delivered; that brooding conditions for defendant's poults were ideal. He corroborated the testimony of the other growers who bought from the same two hatches that defendant's poults came from. He testified that the brooding conditions used by all the purchasers were conducive to bring about the same results as the brooder conditions of defendant, that defendant's poults were the only ones fed on feeds furnished by plaintiff, and that the only turkeys from the hatches in question from which normal, or better than normal, results were not obtained were the poults fed on plaintiff's feed.

There is absent any evidence that the conditions under which defendant's poults were brooded, colonized and ranged were not ideal. The testimony of plaintiff showed that its representatives were on defendant's premises frequently and had every opportunity to observe the conditions surrounding the care of the turkeys, yet no objections were made so far as the record discloses. Plaintiff had more than a passing interest in this flock. It was security for the feed furnished defendant. It is inconceivable that, if plaintiff's representatives felt that its security was being jeopardized, suggestions looking to safeguarding the flock would not have been made.

Mr. Bonie testified that he had been with H. J. Bonie Poultry Company for 20 years; that the company hatched its eggs, sold the poults and purchased the finished turkeys back in the fall. He testified: "It's my duty to sell the poults, deliver and to service the poults, trouble shooting and whatever is required of me." He checks the flocks sold by the company about once a month to see how they were getting along. He had done servicing for 7,000,000 or 8,000,000 turkeys.

He testified that he found no trouble with any of the flocks except defendant's. He stated "We ran into a problem there that I couldn't analyze, * * * I simply

told them to take them to the college and have them examine them and have them recommend something. * * *"

"I thought it was a nutritional condition. They had cankerous mouths and dry feathers, which was an indication they weren't getting the nutrition they should have. * * *"

Dr. Miner testified as follows:

"Assuming that the poults, all poults came from one hatch and that they were raised under the same conditions, transported and raised under the conditions up to the age of twelve weeks, and only one group of the hatch showed nutritional deficiency, it would certainly point toward a lack of nutrients in the feed."

Defendant testified as to the additional amounts of feed required to ready the birds for market. In addition to the testimony of Amie Bonie and defendant, Mr. Grant White testified that birds that suffer from malnutrition or some other weakening process during the brooding season will be slowed down in their growth, and that they would eat more food to reach prime condition. Jay Hodges who brooded this flock testified that a weakened turkey will be undersized, will not mature as rapidly, nor put on as much weight as a turkey that has not been weakened.

We are of the opinion that there was ample competent evidence to justify the inference by the jury that the feed was deficient and proximately caused defendant's damage. This court has held that the question of proximate cause is a jury question.

In Park v. Moorman Mfg. Co.,[1] this court speaking through Mr. Justice McDonough said, 121 Utah at pages 351–352 and 241 P.2d at page 920:

"Appellant further contends that the evidence in this case is insufficient to justify the inference that plaintiff's loss was the proximate result of the use of either the feed or the method of feeding or both. The record contains testimony of defendant's own veterinarian that the feed or plan could have caused plaintiff's loss. There was further testimony of other witnesses who had used the feed and had had undesirable results. The inferences drawn by officers of defendant company and by buyers from plaintiff that the chickens on defendant's feed and plan were far below the other chickens on the other plan, and that such condition came within a significant period after defendant's feed and plan were adopted is further evidence of proximate cause. This question of proximate cause is likewise a jury question. Taking the evidence most

1. 121 Utah 339, 241 P.2d 914, 40 A.L.R.2d 273.

favorable to the plaintiff, there is substantial evidence established by the record to support the jury's implied finding as to proximate cause of the loss."

We are likewise of the opinion that no reversible error resulted from the reference by defendant's counsel to the question of insurance coverage before the jury. W. S. Young, president of plaintiff company, was examined by plaintiff's counsel as to plaintiff's Exhibit 3, a ledger sheet of defendant's account showing charges and credits. The sheet was admitted in evidence. One of the items shown on the exhibit was as follows "V1825 Insurance $250.00." Counsel for defendant took the position that since Exhibit 3 contained an item of $250 for insurance which was not provided for in the mortgage that he was entitled to inquire fully into the matter to determine if it was a proper charge. The witness Young, president of plaintiff company, testified that six charges had been erroneously entered against defendant which were later reversed. The witness on cross-examination was asked the following questions and gave the following answers:

"Q. You spoke of some insurance with a charge of $250.00 made against the defendant Fredrickson: is that correct? A. Yes sir.

\* \* \* \* \* \*

"Q. And that premium of $250.00 was charged against the defendant on this account? A. It was.

"Q. And that is a part of the amount that your company is now suing for? A. Yes sir.

\* \* \* \* \* \*

"Q. Can you tell from the policy in whose favor it runs? A. Earl Fredrickson and Farmers Grain Co-operative as interest may appear.

"Q. Do you know whether or not there was any other insurance *on these turkeys or this account?*

"Mr. Stine: I object to the question.

"The court: Overruled. Was there any other insurance? A. I know of no insurance *directly on these turkeys* other than that. We did have *some other types of insurance,* but not on these particular birds.

"Q. Did you have *any other insurance on this account?* A. *Well not on his account in particular.*

"Q. What do you mean by that? A. I think we are insured for any damages which may arise *for defective feed.* I have never seen that policy, but I'm sure we have such a policy." (Emphasis added.)

Plaintiff admits that without solicitation by defendant the fact of insurance cover-

age was injected inadvertently as a part of plaintiff's case from the testimony of plaintiff's salesman Leonard. He testified as follows:

"Q. Was any further discussion had at that time? A. Yes. . .

"Q. As to the causes of the death, possibly? or shortages? A. He brought up the various factors mentioned, if there couldn't have been an error in our books or an error somewhere along the line in the amount of feed consumed and various phases of that. We were still trying to find out what might have happened and in the meantime he had just come from Wilfred Young's office over in the main building and advised me that Wilfred Young had told him that we were insured in regards to trouble that might occur from the use of our feed. Therefore, he was wondering if maybe it wouldn't be wise to enter a claim against the insurance company and settle the thing up.

"Q. Any further conversation take place? A. I told him that if his claim substantiated the facts in the case, I agreed with him heartily, that at the time I doubted very much that he had a claim that would hold up. I advised against such practice.

"Q. And what did you say to him as regards the merits of the claim?

A. I told him I doubted very much that he'd be able to prove that the feed was insufficient, a deficiency. Strictly my own opinion. I told him it was strictly my own opinion, but I would hesitate to go ahead and spend a lot of money until I was pretty sure."

The trial court instructed on the question of insurance as follows:

"During the trial mention has been made about various kinds of insurance which the plaintiff may or may not have been carrying; and the name of the Cache Valley Turkey Growers has been brought into this case. None of these people have been named as parties and are not, therefore, on trial here in any way * * *. So far as the court is aware, there is no insurance involved in this case, but even if insurance was involved, such a situation should have nothing to do with your answers to the questions."

■ If any error was committed by counsel for defendant in asking about other insurance on defendant's turkeys or defendant's account, it was cured by the testimony given in direct examination by plaintiff's witness Leonard and if there were any question we are of the opinion that the court's instruction cured the same.

Affirmed. Costs to defendant.

McDONOUGH, C. J., and CROCKETT and WADE, JJ., concur.

HENRIOD, J., concurs in the result.