**FIRST SECURITY BANK OF UTAH, a National Association, Plaintiff and Appellant,**

v.

**UTAH TURKEY GROWERS, INC., a Utah Corporation, Defendant and Respondent.**

No. 16354.

Supreme Court of Utah.

March 21, 1980.

Don B. Allen & James L. Wilde of Ray, Quinney & Nebeker, Salt Lake City, for plaintiff and appellant.

Tex R. Olsen of Olsen & Chamberlain, Richfield, for defendant and respondent.

HALL, Justice:

Plaintiff appeals from the dismissal of its action for recovery of funds allegedly due under a security agreement.

Defendant is an agricultural marketing cooperative operating in Utah, which processes and sells turkeys raised by its member growers. It has operated on a nonprofit basis since 1971. On a yearly basis, defendant takes the live turkeys grown by its members, pools them into a common flock, slaughters, dresses, and freezes them, and then sells them to a national marketing cooperative known as Norbest Turkeys. Norbest makes cash pay-

ments for the birds delivered, which proceeds are then distributed to the member growers by their percentage contribution to the flock processed and sold. Norbest often makes cash payments to defendant before it is able to sell the turkeys purchased, which payments are based on market estimates of eventual proceeds. To the extent that these estimates prove inaccurate, later adjustments, in the form of "chargebacks" or additional payments, are made, such that the growers themselves carry the risk of market fluctuations.

One of defendant's member growers, a partnership known as Carlson Brothers, has financed its operations through plaintiff for many years. Financing has taken the form of advances pursuant to separate annual security agreements, which agreements pledge the turkeys grown, and any proceeds derived therefrom, as collateral. Rather than making payment of Carlson Brothers' proceeds to that member directly, it has long been defendant's practice to receive such proceeds in trust, and pay them directly to plaintiff in satisfaction of the advances made during the growing year.

While plaintiff makes the loans in question on an annual basis, and relies on advance estimates of net proceeds for any given year in approving the loan, it is clear that defendant's operations (and those of Carlson Brothers) are not totally divisible into yearly units. Debits and credits, due both to payment adjustments from Norbest (some of which, as will be seen, are carried over several years) and to loans from other sources (as, for instance, a loan negotiated with the Sacramento Bank for Co-ops, in order to comply with a 1971 order from the Department of Agriculture for upgrading and expanding defendant's facilities) overlapped yearly boundaries on a regular basis. As such, accounts could never be said to be cleared at the end of any given year.

In 1973 and 1974, the turkey market in the United States dropped sharply, causing Norbest to realize substantially less on its inventory than it had paid out to selling cooperatives such as defendant. While, under such circumstances, a chargeback to the cooperatives was in order, the reverse settlement was not made immediately, but was carried forward on Norbest's books, defendant believing that adjustments were being made, and investigating the matter no further. Where relevant here, the Norbest payments in excess of market prices resulted in overpayment to Carlson Brothers (or rather to plaintiff on Carlson's account) of $64,254.00 in 1973, and $120,027.00 in 1974.

In December of 1974, defendant issued to plaintiff, as an advance payment on total annual proceeds owing to Carlson Brothers, a check for $262,362.47. Later, in 1975, a final payment for 1974 proceeds was made to plaintiff in the amount of $759,337.97, a figure which, unknown to defendant at the time due to "oversight," included the funds already paid to plaintiff the preceding December. This overpayment brought the total of excess revenues paid to plaintiff on Carlson's account to $457,606. It is to be noted that neither defendant nor plaintiff appear to have noticed the overpayments at the time they occurred.

Apparently unaware of these overpayments, plaintiff, in June of 1976, requested that Carlson alter its marketing arrangement with defendant, evidently in an attempt to better solidify plaintiff's security interest. The new arrangement, known as a "live flock" contract, which took effect for the 1976 growing year, required a segregation of Carlson's turkeys from the common flock marketed by defendant, the Carlson turkeys being subject to direct marketing and separate payment by Norbest. The main feature of the new arrangement was that Carlson Brothers (through plaintiff) received flat payments for the turkeys marketed at the time of sale, which payments were not later subject to "reverse settlements" or "chargebacks" due to vacillating market conditions. Under the agreement, Carlson Brothers warranted valid title to the turkeys sold, with the exception of mortgages or other encumbrances for any of which Carlson Brothers would completely indemnify defendant.

At the time the agreement was reached, plaintiff had already made substantial ad-

vances to Carlson Brothers for the 1976 growing year. According to plaintiff's claim, these advances were based on a letter, dated January 7, 1976, from a Mr. Gaylord Harward, Manager of defendant's business office. The letter was in response to a telephone call from plaintiff's office in Salina, Utah, requesting figures regarding the number of pounds of turkeys held in Carlson Brothers' name as of that date. The letter gave the requested tonnage figure, together with references to past advances to Carlson Brothers by plaintiff, and to anticipated revenue receipts if current market conditions held. No mention of overpayments or anticipated setoffs was made, either in the telephone conversation or in the letter engendered thereby.

An independent audit of defendant's books, conducted in July of 1976, revealed the unaltered state of the 1973–1974 chargebacks being carried by Norbest, and also the inadvertent overpayment to plaintiff in 1975. A meeting followed these discoveries, at which it was resolved that these excess advances and overpayments would be recovered out of future production (or future sales of present inventory) in order to adjust accounts. Notice of this decision (as impacting particularly on Carlson Brothers) was given to plaintiff. It is apparent that this notice did not halt plaintiff's advancements to Carlson Brothers, at least one of which was made following receipt of notice of the anticipated setoff and prior to the end of the 1976 growing year.

The close of the 1976 growing year yielded no payment whatever to plaintiff on Carlson's account, the total setoff being greater than the 1976 revenues by $31,-213.00 which amount is still outstanding. The total setoff figure also included $28,-427.65 in accounts receivable owing defendant from Carlson Brothers due to payment of insurance policy premiums for an unspecified period.

Plaintiff brought this action in the interest of recovering the proceeds from the sale of Carlson Brothers' 1976 flock, alleging the setoff to be invalid. Defendant answered and counterclaimed for certain overpayments allegedly still outstanding. Following a trial to the court sitting without a jury, both claims were dismissed. The court made the following findings relevant to this appeal: (1) plaintiff, by its course of dealing with Carlson Brothers and defendant, manifested an intent that the turkeys be sold and processed, and thereby waived any security interest therein following sale; (2) defendant was negligent neither in failing to promptly rectify the 1973–1974 chargebacks nor in failing to uncover the inadvertent overpayment in 1975; (3) defendant's January, 1976 letter to plaintiff was not negligent misrepresentation, as it answered all inquiries put to defendant correctly; (4) defendant had no pecuniary interest in the relationship existing between Carlson Brothers and plaintiff; (5) the 1976 offset by defendant was valid, as there was mutuality of obligation between Carlson Brothers and defendant; (6) plaintiff did not change its position in reliance on the representations of defendant or the 1976 audit; and (7) plaintiff suffered no damage by reason of the setoff of overpayments, but in fact was benefited in the amount of $31,213.00.

On appeal, plaintiff seeks reversal of the trial court's dismissal of its claim. Defendant seeks affirmance of the trial court action, but asks no reversal of the dismissal of its counterclaim.

For ease of reference, we will hereafter refer to those proceeds withheld by defendant which represent overpayments to plaintiff in past years as "overpayments," and to those funds withheld in satisfaction of debts owed to defendant by Carlson for payment of insurance premiums as "accounts receivable."

At no point in its argument does plaintiff demonstrate error in the trial court's finding that plaintiff was not monetarily damaged by defendant's recoupment of the overpayments from the 1976 proceeds. It is implicitly conceded that, as a matter of accounting, defendant's recoupment of prior overpayments from the 1976 proceeds "balanced the books," setting right the unearned benefit bestowed upon plaintiff in

prior years. Plaintiff, in fact, would benefit substantially, even were this Court to leave the recoupments claimed by defendant undisturbed; plaintiff received the use of nearly half a million dollars for a substantial period of time, which it now pays back, interest free, in the form of a recoupment, and is granted a $31,213 windfall by defendant's decision not to appeal the judgment dismissing its counterclaim for excess overpayments.

■■■ This lack of injury, if left unchallenged, is fatal to every claim of recovery asserted by plaintiff. It becomes immaterial whether or not plaintiff held a valid and perfected security interest in the turkeys raised by Carlson Brothers, or in the proceeds from the sale thereof; the Utah Uniform Commercial Code specifically provides that all remedies for injuries thereunder shall be applied solely to compensate the aggrieved party for actual losses—no punitive awards are permitted.[1] Plaintiff also claims that defendant negligently "misrepresented" material facts regarding 1976 proceeds, thereby giving a right of recovery, as defendant allegedly had a pecuniary interest in the transaction.[2] This claim must likewise fail in the absence of any evidence of injury to the plaintiff engendered thereby.[3] Plaintiff's attempt to recover under a theory of restitution is similarly hampered, in that such theory is predicated upon the bestowal of unjust enrichment or the suffering of unjust detriment.[4] Under the prevailing facts, the unjust enrichment in the present case was rectified, rather than perpetrated, by defendant's decision to recoup the overpayments out of the 1976 proceeds.[5] Plaintiff's theories of equitable estoppel and promissory estoppel likewise proceed on the assumption that the plaintiff has relied *to his detriment* on representations or promises of the defendant.[6]

Finally, plaintiff's claim of tortious conversion of the turkeys or the proceeds from the sale thereof fails where it is shown that plaintiff suffers no injury thereby.

Plaintiff does make several assertions with regard to defendant's right to withhold the 1976 proceeds, notwithstanding any actual monetary impact caused thereby. Plaintiff asserts, first of all, that the parties had been in the practice of settling all accounts at the conclusion of each year, such that chargebacks never spilled over from one year to another. This being their course of dealing, asserts plaintiff, chargebacks from prior years against 1976 proceeds were barred, particularly in light of the "live flock" agreement entered into prior to the withholding of the overpayments. This assertion does not justify recovery. As the trial court found (and as is well borne out by the evidence), plaintiff's business relations with Carlson Brothers and defendant did not proceed as a series of detached yearly segments, but was subject to adjustments whenever necessary. We recognize plaintiff's difficulties in trying to do business under such circumstances, but cannot ignore the fact that they were voluntarily entered into, and were not rectified until the spring of 1976, by which time the overpayments which are the subject of this litigation had already taken place. Plaintiff cannot hope, by a prospective change of arrangements, to permanently seal the door against financial repercussions arising from the old system, and unjustly retain funds inadvertently paid thereunder.

■ Plaintiff also suggests that defendant's decision to recoup the overpayments out of 1976 proceeds was improper, in that no mutuality of obligation existed in the present case. By plaintiff's view, defendant's claims and demands were against

---

1. U.C.A., 1953, 70A–1–106.

2. The claim was based on Restatement 2d, Torts, § 552.

3. *Thompson v. Jacobsen*, 23 Utah 2d 359, 463 P.2d 801 (1970); *Park v. Moorman Mfg. Co.*, 121 Utah 339, 241 P.2d 914 (1952); see also Restatement 2d, Torts, § 552(2), § 552(B).

4. Restatement, Restitution, § 1, Comment (e).

5. See discussion infra, regarding defendant's right to seek restitution by self-help.

6. *Carnesecca v. Carnesecca*, Utah, 572 P.2d 708 (1977); *Baggs v. Anderson*, Utah, 528 P.2d 141 (1974).

Carlson Brothers, whereas the 1976 proceeds were due the bank directly. While we concur with plaintiff's assertion that recoupment and setoff must rest upon a mutuality of obligation,[7] we do not agree that it was lacking in the present case. Under the findings of the trial court, and the terms of the security agreement between plaintiff and Carlson Brothers, all proceeds from the sale of Carlson Brothers turkeys were committed to the satisfaction of the debt owing plaintiff. Hence, defendant held such funds in trust. It was in this fiduciary role that defendant both assumed the obligation to satisfy the Carlson Brothers debt to plaintiff, and asserted the right of recoupment of the overpayments on behalf of Carlson Brothers. It is only where the claim is held against a defendant in his fiduciary capacity, and the right of setoff is asserted by him in an individual capacity (or vice versa), that mutuality is lacking.[8]

Plaintiff suggests, finally, that defendant's recoupment of the overpayments amounted to restitution by self-help, which was improper in light of the fact that plaintiff had changed its position in reliance on defendant's representations, with the result that restitution was unjust. Plaintiff asserts that, had it known in advance of the intended recoupment, it would not have made the 1976 advances. By making the advances, and approving the sale of the 1976 flock (thereby, according to the trial court's finding, releasing its security interest therein), plaintiff allegedly relied to its detriment on such representations, making restitution inequitable. It is to be pointed out that, had plaintiff elected not to make advances during 1976, defendant would have had alternate means available to pursue restitution of the overpayments. The election to make the 1976 payments simply enabled defendant to obtain restitution by recoupment, which procedure was not improper.[9] In any case, there is the evidence to the effect that, as indicated above, plaintiff made at least one advance following receipt of notification regarding the intended recoupments. With regard to plaintiff's "release" of its security interest in the turkeys sold in 1976, it is rudimentary that a security interest creates rights in the secured party only to the extent of the indebtedness so secured.[10] By electing to recoup the overpayments out of the 1976 proceeds, rather than carrying the overpayments forward on its books and treating the advances as an outstanding indebtedness, defendant extinguished the only debt to which plaintiff's released security interest could attach. As such, plaintiff parted with nothing of value, and defendant's recoupment works no injustice.

While plaintiff thus has no right to recovery of the overpayments recouped by defendant, the setoff of $28,427.65 representing defendant's accounts receivable from Carlson Brothers presents a different question. The proceeds withheld for this purpose were claimed in satisfaction of a debt existing solely between defendant and Carlson Brothers; it represented no funds which had ever been paid to, or owed to, plaintiff.

It is to be observed, first, that plaintiff, whether or not it released its security interest in the turkeys raised by Carlson Brothers upon their sale, retained a security interest in the proceeds of that sale.[11] This security interest was not erased by plaintiff's acquiescence in, or approval of, the sale of the turkeys.[12] By reason of this fact, plaintiff had a claim on the 1976 proceeds superior to that of defendant, who was, in effect, an unsecured creditor with regard to its accounts receivable. This being the case, the retention of the accounts receivable amounted to an unlawful conversion.

7. 20 Am.Jur.2d Counterclaim, Recoupment, and Setoff, § 74 et seq.

8. *Cook v. Jones*, 115 Utah 536, 206 P.2d 630 (1949); *Wood v. Akridge*, 84 Utah 468, 36 P.2d 804 (1934).

9. *Freston v. Gulf Oil—U. S.*, Utah, 565 P.2d 787 (1977); Restatement, Restitution, § 4(a).

10. U.C.A., 1953, 70A-9-502(2).

11. U.C.A., 1953, 70A-9-306(2).

12. Id.; see also *Baker Production Credit Assn. v. Long Creek Meat Co., Inc.*, 266 Or. 643, 513 P.2d 1129 (1973).

It should be noted, moreover, that setoff was improper with regard to the accounts receivable, in that there was a genuine lack of mutuality. Plaintiff asserted its claim on the 1976 proceeds against defendant in its fiduciary capacity, while defendant attempted to set off against that obligation a debt owed it, in its individual capacity by Carlson Brothers. As such, the remedy of setoff was improperly invoked.

The ruling of the trial court is affirmed except for that portion thereof which approved the setoff of the accounts receivable from Carlson Brothers.[13] In respect thereto, we reverse and remand with directions to enter judgment in favor of the plaintiff in the amount of $28,427.65. No costs awarded.

CROCKETT, C. J., and WILKINS and STEWART, JJ., concur.

MAUGHAN, Justice (dissenting):

For the following reasons I dissent.

The circulated opinion cites the findings of the trial court, one of which is as follows: ". . . (7) plaintiff suffered no damage by reason of the setoff of overpayments, but in fact was benefited in the amount of $31,213.00."

and:

"At no point in its argument does plaintiff directly contest the trial court's finding that it was not monetarily damaged by defendant's recoupment of the overpayments from the 1976 proceeds."

The opinion concedes, were this Court to leave the recoupments undisturbed, plaintiff would be substantially benefited, and in addition it concedes plaintiff "is granted a $31,213.00 windfall by defendant's decision not to appeal . . . .."

The opinion affirms the ruling of the trial court except for that portion which approved the set-off of the accounts receivable from Carlson Brothers. It then proceeds to reverse and remand with instructions to enter judgment in favor of plaintiff in the amount of $28,427.65.

It is apparent the trial court had this in mind when it made its finding No. 7. The trial judge found no force in the questioned $28,000 set-off, for the reason that it knew the bank had already been benefited directly by a $31,000 overpayment. To enter any kind of an additional judgment in favor of the bank is to give the bank a double recovery.

---

13. The dissent suggests that we affirm the trial court's dismissal of plaintiff's entire claim, on the grounds that plaintiff has benefitted in the amount of $31,213, which should be set off against the requested recovery of the accounts receivable. Such a setoff is conceptually impossible without at least a de facto disinterment of defendant's abandoned counterclaim. Defendant's express election not to pursue a timely appeal of the trial court's ruling on that counterclaim goes to the jurisdiction of this Court, and prohibits our fashioning relief in light thereof, however meritorious the claim might have been if raised. See *In re Estate of Ratliff,* 19 Utah 2d 346, 431 P.2d 571 (1967). Even absent such a difficulty, we may not honor the dissent's suggestion that complete affirmance is warranted, based on the trial court's "recognition" that both the claim for the accounts receivable and the counterclaim were valid. Such tailoring of judicial remedy by use of speculation and second-guessing regarding matters appearing neither of record nor in the arguments on appeal is improper procedure for an appellate tribunal. See *Reliable Furniture Co. v. Fidelity and Guaranty Insurance Co.,* 14 Utah 2d 169, 380 P.2d 135 (1963); *Corbet v. Corbet,* 24 Utah 2d 378, 472 P.2d 430 (1970); *Association of Obstetrics and Female Surgery, Inc. v. Apollo Productions, Inc.,* Utah, 542 P.2d 1079 (1975).