**Joseph M. QUAGLIANA and Paula L. Quagliana, Plaintiffs and Appellants,**

v.

**EXQUISITE HOME BUILDERS, INC., et al., Defendants and Respondents.**

**No. 13723.**

Supreme Court of Utah.

June 27, 1975.

Bryce E. Roe, Roe & Fowler, Salt Lake City, for plaintiffs and appellants.

Orval C. Harrison, Donald Sawaya, Wayne Ashworth, Salt Lake City, for defendants and respondents.

MAUGHAN, Justice:

Here on appeal is a matter involving two contracts, one for the design, and the other for the construction of a residence. It was tried to the court, sitting without a jury, and from money judgments in favor of defendants and against plaintiffs, plaintiffs appeal.

In the spring of 1971, plaintiffs wanted to build in Salt Lake City, utilizing plans previously used by Mrs. Quagliana's father. Some changes were desired in the plans, and for that reason the services of K. M. Design were engaged. K. M. Design is a partnership, with Gary Margetts and Allan Kruckenberg as partners, hereafter referred to as K. M.

An oral agreement was entered into by plaintiffs and K. M., under which K. M. agreed to prepare modified plans and specifications. Plaintiffs wanted a home in the Oak Hills area, and modified plans and specifications were to provide them with a view of the valley below. At that time, plaintiffs did not own a building lot, but began looking for one.

Subsequently, plaintiffs located a potential building lot on Sherwood Drive, in the Oak Hills area. At this juncture, plaintiffs requested Exquisite Home Builders, Inc., hereafter referred to as Exquisite, acting through one Marstella, an employee and representative of Exquisite, and K. M., to look at the lot to determine its suitability as a site for the home. K. M. acting through one Margetts and Exquisite, acting through Marstella, did so, and K. M. advised the plaintiffs that the lot was suitable, and that the home would fit on the lot properly. Margetts also said there would be a view. At the time no bargain had been struck between plaintiffs and Exquisite. Plaintiffs thereupon purchased the lot and K. M. prepared a plot plan showing the location of the house on the lot.

In October of 1971, a written agreement was executed by Exquisite and plaintiffs. The agreement contained the following provisions material to the issues in this case:

1. SCOPE OF WORK: Contractor agrees to provide all the labor and materials and do all things necessary . . . upon the building site . . . in strict accordance with this contract, the plans and specifications hereunto attached and made a part hereof . . . and in strict compliance with all applicable laws, ordinances and other governmental regulations affecting such construction.

4. . . . agrees to complete the construction of the dwelling house and improvements according to the plans and specifications, all applicable laws, ordinances and other government regulations applicable thereto, as well as in a manner satisfactory to the Owner and the Lender, . . . ..

The location of the building and improvements upon the above described building site shall be made by the Contractor, and in making said location, he

shall comply with all zoning ordinances and regulations and all building restrictions and protective covenants governing said real property.

17. LENDER'S COURTESY SERVICE: As a matter of courtesy and favor, the Lender has supplied the Owner and Contractor with this suggested form of agreement. The parties hereto declare that it was entirely optional with them to use said form and that they voluntarily adopted and completed same.

The plot plan prepared by K. M. showed a 30-foot setback on one street and a 20-foot setback on Sherwood Drive. It was this plot plan together with plans and specifications which Exquisite submitted to Salt Lake City, in making application for a building permit. At the time of submission the city's representative struck out the words "20 feet" and inserted the word "average," meaning the average setback for houses located on the same side of Sherwood Drive.

Exquisite engaged an engineering company to stake out excavation lines, directing the engineer to stake the lines exactly as shown on the original plot plan. After the excavation was completed, plaintiffs visited the property and discovered that the home was so located that there would be no view of the valley. Indeed, Exquisite, through Marstella, testified that it was fairly obvious at that time that the house would face directly onto the back of the other house, and "would look up into the front hill on the northeast of the valley."

At this point Marstella and plaintiffs attempted to rotate the location of the house on the lot to provide the view of the valley which plaintiffs desired. Exquisite then had a new plot plan prepared by a firm other than K. M. which, like the old one, showed a setback of twenty feet on Sherwood Drive; again the city changed it to "average"; and again Exquisite had the excavation lines staked providing only a 20-foot setback. No effort was made to determine what the average setback was on Sherwood Drive.

At about this time plaintiffs were informed that plans and specifications for residences built in that area had to be approved by an Architectural Supervising Committee for the subdivision. The land in this particular subdivision is burdened with certain restrictive covenants, and the purpose of the Architectural Supervising Committee is to prevent construction which would violate these covenants. Plaintiffs requested Exquisite to submit the plans to this Committee, which it did, with a note asking that they be approved. The plans were not approved by this Committee, because the restrictive covenants required a minimum setback of 30 feet, and a roof of a lesser pitch than the one designed. Prior to receiving the letter of disapproval, Exquisite had poured the concrete and the error had been cast in stone. At about the same time, inspectors for the city placed their "stop order" on construction.

These latter events put a stop to construction work, which was never resumed. Negotiations between plaintiffs and Exquisite produced no arrangements which would satisfy the purpose of the construction agreement, the city ordinance, or the restrictive covenants.

About a month after construction ceased plaintiffs requested their lender not to disburse any more funds to Exquisite; without their approval. Further negotiations between plaintiffs and Exquisite produced no solution, and on March 9, 1972, counsel for plaintiffs wrote to Exquisite terminating the company's right to proceed further with the construction, and telling them that plaintiffs would look to them for damages for breach of contract. Plaintiffs purchased a house in another area, and in December of 1972 sold the subject lot, for an amount in excess of its purchase price.

The court below concluded that plaintiffs had breached the contract by suspending payment, and by refusing to let Exquisite proceed further with construction; and that Exquisite was entitled to recover unreimbursed costs. It also concluded that plaintiffs' agreement with K. M. was to

pay $1,000 for the plans and specifications, that only $500 had been paid, and that K. M. was entitled to recover the balance of $500 from plaintiffs.

Plaintiffs attack the judgment, making six assignments of error. These will be dealt with in their order.

First, plaintiffs claim the court should have found that the footings and foundations set by Exquisite violated the setback provisions of the Salt Lake City zoning ordinance and the restrictive covenants of the subdivision. We agree. This was a material issue, and although a finding of it was requested it was refused. It is the duty of a trial court to make findings of fact with respect to all contested issues in a case.[1] One of the principal issues in this matter is the effect the 20-foot setback provision had on the activities and obligations of the parties here concerned. The record is replete with evidence upon which such a finding could be made. The testimony of Mr. Harry Hurley, zoning enforcement officer for Salt Lake City, corroborated by the testimony of Marstella, was that the 20-foot setback provision was stricken by the city and the word "average" written in. This occurred on two different occasions. Hurley further testified that the "average" on Sherwood Drive was thirty feet, that the city didn't enforce private covenants, and that the work was stopped because of the setback requirements. A member of the Architectural Committee for St. Mary's Hills, Plat E, testified that the average setback for the subject location was 30 feet; that the restrictive covenants required a 30-foot setback, and that a 20-foot setback could not be approved. None of this evidence is controverted.

Plaintiffs' second point attacks four findings of the trial court, (as not being supported by evidence), three of which have merit. However, in view of the resolution of plaintiffs' third assignment of error, it is not necessary to deal with point No. 2. This third point claims that Exquisite materially breached its contract when it located the home in such a manner that it did not comply with the zoning ordinances or the restrictive covenants for the subdivision. With this we cannot agree, for the reason there was no contract to breach.

At the time plaintiffs and Exquisite entered into the construction contract, each assumed that the purpose of the contract could be achieved, and that the designed construction could be so placed on the available lot, as to give plaintiffs the house they wanted, and so situated as to provide a view of the valley. This was the purpose of the contract, and was well known to Exquisite and K. M., from the outset. Exquisite promised to locate the house in compliance "with all zoning ordinances and regulations and all building restrictions and protective covenants governing said real property." This it could not do, from the outset.

There is substantial evidence that it was impossible to place the subject residence on the available land in compliance with zoning ordinances, regulations, building restrictions, and protective covenants, and at the same time achieve the purpose of the contract.

With regard to plaintiffs' situation in these circumstances, the Restatement of Contracts sets out the rule applicable here.

Section 288. Frustration of the Object or Effect of the Contract.

Where the assumed possibility of a desired object or effect to be attained by either party to a contract forms the basis on which both parties enter into it, and this object or effect is or surely will be frustrated, a promissor who is without fault in causing the frustration, and who is harmed thereby, is discharged from the duty of performing his promise unless a contrary intention appears.

The evidence here is clear that the object desired by plaintiffs was a specifically

1. *Thomas v. Forrell,* 82 Utah 535, 26 P.2d 328 (1922).

designed house, in Oak Hills, with a view of the valley. This formed the basis on which both parties bargained, and it was frustrated from the outset because it could not be achieved. Further, there is no evidence showing plaintiffs were at fault in causing the frustration.

With respect to the bargain of Exquisite, set out above, the rule which applies is also found in the Restatement of Contracts:

> Section 456. Existing Impossibility.
>
> . . . A promise imposes no duty if performance of the promise is impossible because of facts existing when the promise is made of which the promissor neither knows nor has reason to know.

A case of similar construction, and one involving original illegality of the performance for which contract was made is that of Partridge v. Presley.[2] In that case, a contract for the construction of a dwelling contained a provision whereby the vendor agreed to deliver to the vendee a permit from the District of Columbia for the installation of an additional kitchen in the house, making it a two-family dwelling. But the fact was that the area in which the house was located was restricted by the Maryland Zoning Ordinance to one-family dwellings so that, in the court's view, the condition for furnishing a governmental permit for a two-family dwelling was legally impossible of performance even if, pursuant to a printed clause in the contract, it was to be construed as requiring a Maryland permit for such a dwelling, it was held that the impossibility of performing the condition requiring the vendor to furnish such a building permit, being an impossibility due to domestic law, and not due to the vendor's fault. This rendered the contract invalid at its inception and excused the vendor from liability to the vendee for failing to perform such contract to sell and convey the property to the vendee.

The situation here is not unlike that one found in Faria v. Southwick[3] where a contract for the leasing and cultivation of a tract of land was the subject for an action in fraud, wherein the defendant recovered. On appeal the contract was held to be invalidated by the fact that, unknown to both parties, the land was desert and contained so much alkali and salts as to make impossible the specified forms of cultivation. In that case the parties bargained on the basis of erroneous assumptions, as they did in the instant matter. Consequently, the bargain made by plaintiffs and defendant was void from the beginning.

Here Exquisite and the plaintiffs dealt under erroneous assumptions. Further, there is nothing in the agreement, from which an interpretation can be inferred, that it was the intention of either party to assume the risks produced by the erroneous assumptions. The time significant here is that at which plaintiffs and Exquisite engaged the bargain. At the moment of execution, that for which the bargain was made was impossible of production.

Williston on Contracts[4] is illustrative:
> . . . If the impossibility exists at the time when the contract was made, it may be supposed that one or both parties were aware of the fact or that neither was aware of it. . . . Doubtless if the parties know of the impossibility, they will not make such an agreement. Merely going through a form of words which they know can mean nothing will not make a contract, but by mistake it may well happen that parties execute a writing as their contract which contains a provision impossible of performance.

Exquisite's contract with plaintiffs contain such a provision, viz: to construct in compliance with zoning ordinances and restrictive covenants.

■ Since the performance for which the parties had bargained—the construction

2. 88 U.S.App.D.C. 298, 189 F.2d 645, cert. den., 342 U.S. 850, 72 S.Ct. 79, 96 L.Ed. 642 (1951).

3. 81 Idaho 68, 337 P.2d 374 (1959).

4. Revised edition, vol. 6, sec. 1933.

of a house with a view of the valley, in accordance with the plans and specifications and in conformity with all zoning ordinances and restrictive covenants—was impossible from its inception; the sole remedy available to Exquisite for reimbursement was restitution.

The trial court erred in awarding Exquisite unreimbursed costs it had put in the building. It found plaintiffs had breached the contract and awarded these damages in accordance with Section 346(2)(b) and Section 333 of Restatement of Contracts. Under comment (e) of Section 333, it is explained that the amount of the expenditure as damages in an action under this section is not identical with the remedy of restitution of the value of part performance rendered by the plaintiff. The remedy of restitution requires the return of value received. The remedy of Section 333 covers expenditures without any reference to value received, the outlay of the plaintiff without regard to the result of that outlay, or its benefit to defendant.

■■■ Where a loss is caused by impossibility or frustration neither party can be compelled to pay for the other's disappointed expectations, but neither can be allowed to profit from the situation; one must pay for what one has received.[5] If Exquisite had adhered to its duty set forth in the contract, to locate the house in compliance with city ordinances, and pursuant to this duty determined the "average" setback, it would have discovered the impossibility of locating the house on this particular lot prior to expending money for excavation, footings, and pouring the foundation. These expenditures could have been averted; on the other hand, plaintiffs sold the lot with these foundations and excavations intact, which were subsequently utilized to a certain extent in the construction of a home without a direct view of the valley. To the extent that this work enhanced the value of the lot, and was thus a benefit to plaintiffs, Exquisite should be compensated. However, Exquisite had previously received disbursements as the work progressed, the trial court must determine which party is entitled to restitution by ascertaining the value of the benefit to the land, in relation to the expenditures by Exquisite. Each party must bear its own loss, but neither may profit at the expense of the other.

■■■ Since the contract was impossible to perform from its inception, the bargain engaged was void, and neither party is entitled to attorney's fees pursuant to its provisions. For the same reason, Exquisite's claims that it stood ready to perform, and that plaintiffs breached the contract, by suspending payment, are without merit.

Plaintiffs' fourth point assigns error, for the reason that the court below did not determine that K. M. materially breached its contract with plaintiffs. We think plaintiffs' assignment of error is well taken. The oral contract between plaintiffs and K. M. was engaged prior to the time plaintiffs secured a building lot. The purpose of this contract was well known to K. M., and was the same purpose as that encompassed in the contract with Exquisite. Just prior to the purchase of the building lot by plaintiffs, K. M., together with Exquisite and plaintiffs, made a visit to the proposed site, and plaintiffs were assured by K. M. that the design which had been produced by K. M. was suitable for this lot and would produce for plaintiffs their desired object.

It then drew a plot plan showing its location. This plot plan showed a 20-foot setback, which was contrary to both the city zoning ordinance and the restrictive covenants. At this point K. M. added a new dimension to the contract existing between it and plaintiffs viz., that the design was not only of good quality, but that the site was suitable for construction pursuant to the design.

K. M. knew plaintiffs desired a view of the valley, but it did not inform plaintiffs

5. See Comment of Subsection (3) of Section 468, Restatement of Contracts.

that, in order to fit the house on the lot, the view would be obscured. K. M. admitted that one of the first steps a designer takes is to consult with the city and ascertain setback requirements so that a house will fit on the lot. Whether K. M. checked the actual setback requirements with the city is somewhat equivocal from the testimony.

Q Mr. Margetts, I understand that you checked the setback requirements of this particular house and lot with Salt Lake City; is that correct?

A Yes

Q And why did you check that setback requirement with Salt Lake City?

A That is the first thing we do on a house, to find out how big a house you can put on it. You certainly don't want to design a house and find out it is too big for the property. It is just standard procedure in our office. This is one of the first things you do.

Q Did you feel some obligation to check those setback requirements?

A No, I didn't because I thought we were plenty fine with the 20 and 30, in my conversation with the City.

Q But you felt some obligation to contact Salt Lake City?

A Yes, I contacted them.

Contrary to the trial courts' finding No. 6, K. M. admitted that it was informed almost immediately of the city's objection to the setback requirements on the plot plan, and that the setback was altered from twenty feet to "average"; yet K. M. did nothing to change or check the plot plan.

This is shown by the testimony of Mr. Margetts, when he was questioned about the time when he knew the City had objected to the 20 foot setback.

A That is the first time I have seen the originals. I was aware there was a change from the City that said "average", but that was the first time that I had seen it.

Q When did you become aware of the change to average?

A Probably right after Mr. Marstella submitted the plan to the City and it came back marked "average".

* * * * * *

Q So you were informed then as soon as that happened or shortly after there had been objection to the setback provision?

A That is right.

Q Then, as I understand it, you never did do anything after that with respect to making any changes in the plans?

A No.

K. M. admitted that customarily it made changes necessitated by building codes. "We tell customers we are responsible up until they get a building permit. We will make changes, yes." K. M. refused to fulfill its obligation, because it had only been paid $500 of the $1,000, the court below found to be the agreed fee.

 Insofar as a municipal ordinance is applicable to a contract, it is by operation of law an implied term of that contract. K. M., as part of its contract, in preparing the plot plan, was obliged to create the plan in compliance with the city ordinances relating to setbacks; in such a way that the purpose of the contract would be achieved—its failure to do so was in breach of its contract.[6] The case of *Davidson v. Prime Homes, Inc.*[7] illustrates the point under consideration and is analogous to the situation of K. M. That case involved a builder, and the court held that in performing his contract, he was required to construct the building in compliance with applicable zoning ordinances. For the same reason a designer who undertakes to situate proposed construction at a particular site, pursuant to his plot plan,

---

**6.** See *Gutowski v. Crystal Homes, Inc.*, 26 Ill.App.2d 69, 167 N.E.2d 442 (1960).

**7.** Colo. Court of Appeals, 506 P.2d 1238 (1973).

is required to do so in compliance with applicable zoning ordinances and restrictive covenants.

 The trial court was of the opinion that the duty to ascertain the existence and requirements of the restrictive covenants concerning the property devolved upon the plaintiffs exclusively, and was not a responsibility of K. M. under its oral contract. This finding is inconsistent with the facts adduced at the trial. When K. M. as part of the contract undertook to advise the plaintiffs as to the suitability of the property for the house plan and executed a plot plan, it became part of K. M.'s responsibility, under the contract, to design and to locate the house in position consistent with all the requirements affecting the property. Although, initially K. M. designed the home without reference to any lot in particular, its subsequent actions clearly indicated an amendment to the original terms when it undertook additional duties.

Concerning the recommendation of K. M., as to the suitability of the lot, Mr. Margetts testified:

Q And did he [Quagliana] have any questions concerning that lot?

A He was just asking based on my experience, a suitable lot for the type of house he wanted to construct.

Q And what was your opinion of that lot?

A I thought it was a good lot. I had looked at one previously and it didn't even begin to do the job he wanted. This was a fine lot.

 It is at this point that K. M.'s contract with the plaintiffs differs from that of Exquisite's with the plaintiffs. In assuring plaintiffs that the lot selected was suitable for the purpose of the contract and that the house could be placed on it properly K. M. warranted that a certain state of facts existed, which did not exist. The fact that it was impossible for K. M. to make good on its warranty is impossibility of a different kind from that which confronted Exquisite at the moment it executed its contract with plaintiffs. K. M.'s warranty is analogous to that of one who warrants that a ship has already arrived at a certain port, thereby promising something impossible if, in fact, the ship has not arrived. By making such a warranty the warrantor promises to pay damages if the facts are not as warranted; and it is in fact an undertaking that the facts exist.[8]

The determination by the trial court reduced the plot plan to a mere illustration of possibilities, rather than a plan upon which others would rely, and follow, in constructing the home.

It is clear that the preparation of the plans, the location of the residence on a lot, and the necessary plot plan, were all terms of the contract between plaintiffs and K. M.; the *purpose* of which was to provide for plaintiffs a specified set of plans, for a particular building, so situated as to provide a specifically described view of the valley. This is so because these terms were known to K. M. from the beginning, prior to the time the lot was purchased, and at the time K. M. assured plaintiffs that their desired home could be so located, on the lot being considered for purchase, as to provide the desired view; thereby inducing plaintiffs to purchase the lot. In addition, the testimony from K. M. was that it remained responsible up to the time a building permit was secured; that it made changes in plot plans, but did not here, because it was not paid. Also, K. M. sued plaintiffs for the $500 remaining to be paid in discharge of its $1,000 fee, defending only the allegation of plaintiffs that the fee also included supervision—no defense was made that the fee did not include the plot plan. To come to any other conclusion an unwarranted assumption would have to be made—that the plot plan was a gratuity, and there is no evidence even as much as to intimate such.

8. Williston on Contracts Revised Edition, vol. 6, sec. 1934.

However, were we to assume that the plot plan was a new contract, and the claim made that it was not supported by consideration, such a defense (which was not made) would avail nothing, because of the applicability of the doctrine of promissory estoppel. K. M.'s representation induced action of a substantial character, on the part of plaintiffs, to plaintiffs detriment. This promise to place the home on the lot to achieve the specified view is binding, for the reason that injustice can only be avoided by awarding damages for its breach. Section 90, Restatement of Contracts, under the heading of "Informal Contracts Without Assent or Consideration," is as follows:

"A promise which the promissor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by the enforcement of the promise."

See also, *Easton v. Wycoff* for a discussion of the principle, which we here apply.[9]

K. M.'s failure to perform in accordance with what it had promised under the terms of the contract constituted a breach which entitled plaintiffs to compensation for the injury caused thereby. Plaintiffs are entitled to compensation for those injuries which K. M. had reason to foresee as a probable result of its breach. The trial court should have ascertained the amount of damages sustained by plaintiffs and offset them against the $500 which was awarded to K. M.

Reversed and remanded with instructions to determine damages and restitution in accordance with this opinion.

ELLETT, CROCKETT and TUCKETT, JJ., concur.

HENRIOD, Chief Justice (dissenting):

I dissent in reluctant obeisance to the tried, trite and tired rule that, in a voluminous case, as is this, where tempers aren't dulled, but sharpened,—the trial court better may have been advantaged in appraising the parties and their witnesses, and their inconsistencies.

To send this case back would create at least one new lawsuit, in my opinion—possibly three,—or four,—but at least a series of lifetime hatreds and attorneys' fees,—and another appeal to this court.