Kenneth H. JEANGUNEAT and Barbara D. Jeanguneat, Appellees,

v.

JACKIE HAMES CONSTRUCTION COMPANY, Appellant.

No. 49901.

Supreme Court of Oklahoma.

March 14, 1978.

B. Jack Taylor, Chickasha, for appellees.

James B. Blevins, Blevins & York, Oklahoma City, for appellant.

DAVISON, Justice.

This case involves an appeal from a judgment against a home builder-vendor [1]; Jackie Hames Construction Company, entered in a civil suit commenced by Kenneth and Barbara Jeanguneat, purchasers of a *new* home from the construction company. The Jeanguneat's suit was based upon a breach of an implied warranty that their new home was suitable for human habitation.

Within three weeks of moving into their new home, the Jeanguneats discovered that their well water was not suitable for domestic use. In fact, an analysis of the water by the State Health Department revealed that the amount of suspended solids in the water, turbidity, made the water unacceptable for human consumption. A State Health Department official testified that according to standards set by the State, water with a turbidity value of more than *five* was not considered acceptable for human consumption, and that the Jeanguneat's water far exceeded that upper limit, their water having a turbidity value of *twenty-eight.* Alleging that defects in the

---

1. As used in this opinion, the term "builder-vendor" means a person who is in the business of building or assembling homes designed for dwelling purposes upon land owned by him, and who then sells the houses, either after they are completed or during the course of their construction, together with the tracts of land upon which they are situated, to members of the buying public.

The term "builder", denotes a general building contractor who controls and directs the construction of a building, has ultimate responsibility for completion of the whole contract and for putting the structure into permanent form thus, necessarily excluding merchants, material men, artisans, laborers, subcontractors, and employees of a general contractor.

well furnished by the builder-vendor prevented the normal use and enjoyment of their property, the Jeanguneats sought to be compensated for damage to their personal property caused by the excessive sand and soil in the well water, and for the costs they incurred in drilling a new well. At the conclusion of the non-jury trial, the trial court entered judgment for the Jeanguneats for $1,366.00, together with interests and costs.

In attacking the judgment on appeal, appellant, builder-vendor, asserts that under the laws of Oklahoma there is no implied warranty of fitness in the sale of a *completed* home; that the doctrine of caveat emptor controls, and that even if such an implied warranty exists under the law, the facts in this case render the employment of such a warranty inapplicable. Secondly, appellant asserts that evidence as to specific items of damage was insufficient, and that appellant's demurrer to the evidence, on specific items of damage, should have been sustained.

We first address the issue of an implied warranty of fitness for occupancy in the sale of a completed home by the builder-vendor. In *Jones v. Gatewood,* Okl., 381 P.2d 158 (1963), this Court found that the seller of a house which is being constructed and which, at the time of sale, is not ready for occupancy as a finished house, impliedly warrant that when the house is completed, it will be completed in a workmanlike manner and reasonably fit for occupancy as a place of abode, in the absence of an agreement to the contrary. In reaching that result, we stated, quoting from *Miller v. Cannon, Hill Estates, Ltd.,* 2 K.B. 113 (1931).

" ' * * * The position is quite different when you contract with a builder or with the owners of a building estate in course of development that they shall build a house for you or. that you shall buy a house which is then in the course of erection by them. There the whole object, as both parties know, is that there shall be erected a house in which the intended purchaser shall come to live. It

is the very nature and essence of the transaction between the parties that he will have a house put up there which is fit for him to come into as a dwelling-house. It is plain that in those circumstances there is an implication of law that the house shall be reasonably fit for the purpose for which it is required, that is for human dwelling. * * * ' "

Appellant attempts to distinguish the case before us from *Jones v. Gatewood,* supra, by arguing that the implied warranty found to exist in *Gatewood* was on the sale of an incomplete home, and that in the case before us, no such warranty existed, as the home being sold was completed. In *Carpenter v. Donohoe,* 154 Colo. 78, 388 P.2d 399, 402, the Supreme Court of Colorado stated:

"That a different rule should apply to the purchaser of a house which is near completion than would apply to one who purchases a new house seems incongruous. To say that the former may rely on an implied warranty and the latter cannot is recognizing a distinction without a reasonable basis for it."

Like the Colorado Supreme Court, we see no reasonable basis for the application of different rules based upon whether the new home being purchased in a particular case is completed or incomplete.

In the late 1960s, the Supreme Court of Texas in *Humber v. Morton,* Tex., 426 S.W.2d 544, 562 (1968) stated:

"The caveat emptor rule as applied to new houses is an anachronism patently out of harmony with modern home buying practices. It does a disservice not only to the ordinary prudent purchaser but to the industry itself by lending encouragement to the unscrupulous, fly-by-night operator and purveyor of shoddy work."

In *Schipper v. Levitt & Sons,* 44 N.J. 70, 207 A.2d 314, 326 (1965), the Supreme Court of New Jersey stated:

" * * * [the] contention that *caveat emptor* should be applied and the deed viewed as embodying all the rights and responsibilities of the parties disregards

the realities of the situation. *Caveat emptor* developed when the buyer and [the] seller were in an equal bargaining position and they could readily be expected to protect themselves in the deed. Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale." [Emphasis added]

In *Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P.2d 698, 710 (1966), the Supreme Court of Idaho, in discussing implied warranties in the purchase of new homes, stated:

" * * * The old rule of caveat emptor does not satisfy the demands of justice in such cases. The purchase of a home is not an everyday transaction for the average family, and in many instances is the most important transaction of a lifetime. To apply the rule of caveat emptor to an inexperienced buyer, and in favor of a builder who is daily engaged in the business of building and selling houses, is manifestly a denial of justice. * *

The implied warranty of fitness does not impose upon the builder an obligation to deliver a perfect house. No house is built without defects, and defects susceptible of remedy ordinarily would not warrant rescission. But major defects which render the house unfit for habitation, and which are not readily remediable, entitle the buyer to rescission and restitution. * * * "

In *Waggoner v. Midwestern Development, Inc.,* 83 S.D. 57, 154 N.W.2d 803, 809 (1967), the Supreme Court of South Dakota stated:

"We conclude that where in the sale of a new house the vendor is also a builder of houses for sale there is an implied warranty of reasonable workmanship and habitability surviving the delivery of deed. The builder is not required to construct a perfect house and in determining whether a house is defective the test is reasonablness (sic) and not perfection.

*Schipper v. Levitt & Sons, Inc.,* supra. The duration of liability is likewise determined by the standard of reasonableness."

■ As we are persuaded by the rationale in the above discussed cases, we hold that when a builder-vendor sells a new home, he or she impliedly warrants that the new home is or will be completed in a workmanlike manner and is or will be reasonably fit for occupancy as a place of abode, in the absence of an agreement to the contrary, and that such an implied warranty exists, as a matter of law, both when the new home being sold is completely constructed, and when, at the time of sale, the house is being constructed or is to be constructed.

■ Like the Supreme Court of South Dakota, we hold that under such an implied warranty, the builder-vendor is not required to construct a perfect home, and in determining whether a house is defective, the test is reasonableness and not perfection, and that the duration of liability is likewise determined by the standard of reasonableness. See *Waggoner v. Midwestern Development, Inc.,* supra.

■ In reviewing the action of the trial court, we first take note of the test to be applied when reviewing a judgment of a trial court in an action of legal cognizance tried without a jury. In a court tried action of legal cognizance, the judgment and the underlying findings on issues of fact have the same effect as a verdict of a properly instructed jury, and will not be disturbed on appeal *if there is any evidence reasonably tending to support them. Walker v. Duncan,* Okl., 469 P.2d 647 (1970); and *Sparks v. Midland Supply Company,* Okl., 339 P.2d 1056 (1959).

■ After examining the evidence before the trial court, we hold that the record did contain evidence reasonably tending to support a finding that the implied warranty of habitability was breached. A reasonable inference to be drawn from circumstantial evidence presented, was that the high turbidity in the Jeanguneat's water was

*caused by a defect in the well provided by the builder-vendor.* The record indicates that numerous wells in the immediate vicinity, several of which the defendant provided, including the new well drilled by the Jeanguneats, produced water from the same source, and that all the well water from that source was fit for human consumption—giving rise to the reasonable inference that the high turbidity of the Jeanguneat water was the result of a malfunction in the well, and was not caused by a change in the water itself. Additionally, two Health Department officials testified that they suspected that the probable cause of the high turbidity of the water was improper development of the well and that either the gravel trap or something was not keeping the sand and clay particles from getting into the perforated casing. Both officials also indicated that another occurrence, such as an earth tremor, could have possibly caused the difficulty—no evidence was introduced of any such occurrence. Accordingly, we hold that the evidence presented at trial reasonably tended to support the finding that the implied warranty of habitability was breached. In so ruling, we hold that a builder-vendor's implied warranty of habitability extends to a water well which a builder-vendor, or subcontractor, provides with a new home. Just as the adequacy of electrical connections, waste disposal systems, and the like are warranted to be adequate, so are water supply connections and wells. We need not answer, today, whether builder-vendors of new homes impliedly warrant that the water produced from such wells will have a particular quality, as that question is not before us. We do, however, hold that builder-vendors of new homes do warrant that the water well furnished will be drilled and equipped in a workmanlike manner and be suitable for the ordinary purposes for which it was made. There was sufficient evidence in the case before us reasonably tending to support the conclusion that the well furnished by the defendant, builder-vendor, did not function properly and was not fit for ordinary use, accordingly, we uphold the trial court's finding as to liability.

In so holding, as noted above, we do not decide whether a builder-vendor of a new home impliedly warrants that there will be an adequate supply of water, and that the quality of the water will be sufficient for normal household use. In *Franklin v. Northwest Drilling Company, Inc.*, 215 Kan. 304, 524 P.2d 1194, a case involving the drilling of an irrigation well, the Kansas Supreme Court held that in the absence of an express provision guaranteeing the results of a well drilled, there is no implied warranty on the part of the driller as to either the quantity or quality of water to be obtained. Unlike the Kansas case, the case before us does not involve the drilling of an irrigation well. Rather, it involves a well for household use, provided by a builder-vendor. Because of this distinction, we are not persuaded by the Kansas case cited above, for there is a marked distinction between a contract to drill an irrigation well, and a transaction involving the purchase of a new home in which the builder-vendor provides a well for the purpose of producing water for household use. Even if we were to hold, as in the Kansas case, that there is no warranty as to the quality or quantity of water, the trial court's action would still be affirmed, as the evidence reasonably tends to show that the builder-vendor breached an implied warranty that the well would be drilled and equipped in a workmanlike manner and be suitable to perform the ordinary purposes for which it was made. This being the case, it is unnecessary for us to consider whether or not additional implied warranties as to the quantity and quality of water are present when builder-vendors furnish a water well with new homes.

■ We next consider the issue of damages. In considering the evidence introduced in support of specific items of damage caused by the failure of the well, we apply the same test as above, that is, the trial court's judgment will be affirmed if there is evidence reasonably tending to support the trial court's judgment.

At trial, the plaintiffs sought damages for the following items: [2]

1. The cost of drilling a new well—$764.56.
2. The cost of repairing (scraping) a water heater—$140.00.
3. The cost of repairing damage to the lawn, caused when the new well was drilled (the cost involved was for dirt)—$117.00.
4. The cost of draining the sand and dirt from the septic tank—$40.00.
5. The cost of replacing bed linens, clothing, and towels, etc.—minimum cost of replacement $370.62.

Appellant makes a specific attack on each item of damage, although the trial court's findings were general, and no request was made by appellant for specific finding of facts. We will discuss each item of damage separately.

The evidence produced at trial reasonably tends to support the fact that the drilling of a new well was necessary, as the Health Department official notified the Jeanguneats that a new well would be necessary, and attempts to repair the well by appellee also proved fruitless. Although there was some conflicting testimony, the evidence reasonably tended to support the finding that the well was necessary, and that the cost of repair was reasonable, though there was conflicting evidence—appellees' expert witness indicating he thought the price was a little high.

Likewise, there was evidence tending to support the proposition that the draining of the septic tank was necessary and that the cost was reasonable, although appellant claimed that periodic drainage is necessary from time to time.

Although some of the clothing items which were damaged were still worn on an occasional basis, around the house to work in, and some of the linens might have been retained for use as rags, we find that the evidence reasonably tended to support the need for the clothes replacement, and that the value placed upon the clothes was reasonable.

There was also reasonable evidence tending to support the necessity of repairing the lawn, and that the cost was reasonable, although not all of the dirt purchased was used to fill in the ruts caused by the new drilling. Testimony did however establish that the majority of the dirt purchased was used to repair the specific damage caused by the drilling activities.

 The repair cost, for the scraping of the hot water heater, however, may not have been reasonable, as testimony indicated that the replacement value of the heater might have been less than the cost of repair. However, even assuming that it would have been error for the trial court to award the full cost of repair, we need not consider it, as the judgment awarded did not exceed the total of damages which the evidence before the trial court reasonably tended to support was necessary and reasonable. Had specific finding of facts been made, a different result might have been reached on a specific item of damage, but we need only consider whether the total judgment awarded exceeded the damage proven, in this case by evidence "reasonably tending to support the award." We find that there is sufficient evidence.

For the above stated reasons, we affirm the judgment of the trial court.

AFFIRMED.

LAVENDER, V. C. J., and WILLIAMS, IRWIN, BERRY, BARNES, SIMMS and DOOLIN, JJ., concur.

---

2. Although plaintiff sought to be compensated for items of damage not listed here, the trial court sustained demurrers to the evidence as to the other items of damage involved in the lawsuit—the court's ruling on those demurrers is not before us.