David L. GROEN and Rocky Mountain
Helicopters, Inc., Plaintiffs and
Appellants,

v.

TRI–O–INC., Defendant and Respondent.

No. 17684.

Supreme Court of Utah.

June 29, 1983.

Robert M. McDonald, Suzanne M. Dallimore, Salt Lake City, for plaintiffs and appellants.

H. James Clegg, David G. Williams, Salt Lake City, for defendant and respondent.

OAKS, Justice:

This is an action for personal injury and property damage sustained in a helicopter crash. Judgment was entered on a special verdict for the defendant. On appeal, plaintiffs contend that (1) the verdict of no negligence was not supported by the evidence, (2) the jury was guilty of misconduct, and (3) the district court erred in refusing to instruct the jury on implied and express warranties of fitness.

Defendant Tri-O-Inc. (Tri-O) is an electrical contractor. At the time of the accident, it had a contract to erect electrical towers and string power line in Colorado. It was necessary to string part of the line by helicopter, an operation called "flying wire." Tri-O contracted with plaintiff Rocky Mountain Helicopters, Inc. (Rocky Mountain), to perform the necessary helicopter work. Under the terms of the work order, Rocky Mountain was to supply a helicopter and pilot, and Tri-O was to supply all other equipment necessary to string the wire. Rocky Mountain sent two of its pilots, plaintiff Groen and Joe Candlish, to the job site to perform the contract. Groen, an experienced pilot, was Rocky Mountain's safety officer. He was to teach Candlish how to fly wire.

"Flying wire" requires a helicopter to fly sideways alongside electrical towers. The helicopter threads a 100-foot length of lead rope connected to a steel cable along the towers by laying it into "travellers," which hang from the tower arms. (Later, this cable will be used to pull a larger cable and finally the permanent heavy conductor line through the travellers, where the line is affixed to the insulators on the tower.) There is no precise technique for flying wire. The key elements are precision and an ability to pull the cable at a constant rate of speed. The helicopter's speed varies depending on many factors, including weather conditions, the terrain, and the distance between towers.

Tri-O, through its superintendent, Kenneth Clinger, chose a ½-inch polypropylene twisted rope ("PD–10") as the lead rope with which to fly the wire. Groen had flown wire previously, using "Sampson" rope, which was larger in diameter (¾ inch) and of a different construction (braided rather than twisted). When Groen arrived at the job site, he requested Sampson rope. Clinger told him that he had none in stock but he agreed to supply it and sent a runner to Denver for it.

In the meantime, Clinger asked Groen to get him "out of a bind." Tri-O had already obtained a permit to perform a flying operation across the freeway and had arranged with the Highway Patrol to control traffic.

Tri-O needed Groen to fly wire up to and across the freeway to meet this schedule. Groen was concerned about the strength of the PD–10 rope and repeatedly asked if Clinger was "sure" it would "be strong enough." Clinger, who claimed to be knowledgeable about ropes, assured him that it was.

Relying on these assurances, Groen flew with the PD–10 rope. The first day, conditions were ideal and the work went well. On the second or third day, he flew wire up to and across the freeway. On the far side of the freeway, the rope snagged on the tower arm and broke. Whipsawing back toward the helicopter, it wrapped around the mast with such velocity that it bent the control rods that run alongside the mast, making it impossible to control the angle of the blade. The whirling blade pitched downward, cutting off the tail of the helicopter. The helicopter plummeted approximately 125 feet to the ground, where it crashed, bounced, and crashed again. Groen landed squarely on the base of his spine, suffering permanently disabling injuries. The helicopter was destroyed.

In this action against Tri-O, Groen sought compensation for his personal injuries, medical expenses, and lost earnings; Rocky Mountain sought the value of its helicopter. After the district court refused to give plaintiffs' requested jury instructions on breach of implied and express warranties, the case went to the jury solely on the theory of negligence.

By special verdict, the jury found that neither defendant Tri-O nor plaintiff Groen was negligent. In a separate verdict, the jury found that general and special damages totaling $212,000 would compensate Groen for his injuries. (The parties had already stipulated that the helicopter's value was $37,500 and that this amount would compensate Rocky Mountain.) A judgment

was entered in favor of defendant Tri-O, no cause of action; no damages were awarded. Thereafter, plaintiffs moved for judgment notwithstanding the verdict, and alternatively for a new trial. The court denied both motions, and plaintiffs took this appeal.

## I. Evidence to Support Verdict

The jury was instructed that defendant Tri-O had a duty to use reasonable care in selecting, furnishing, and inspecting the rope and in informing Groen of any known defects or facts that would affect the reasonable safety of the rope, and that the failure to exercise such reasonable care would constitute negligence.[1] On appeal, plaintiffs contend that the jury's finding that Tri-O had not been negligent was unsupported by the evidence, and, indeed, that it was contrary to the weight of the evidence.

It is the exclusive province of the jury to determine the credibility of the witnesses, weigh the evidence, and make findings of fact. *Williams v. Lloyd,* 16 Utah 2d 427, 429–30, 403 P.2d 166, 167 (1965); *Joseph v. W.H. Groves Latter-Day Saints Hospital,* 10 Utah 2d 94, 99–100, 348 P.2d 935, 938 (1960). Where the evidence is conflicting and the jury is properly instructed, we do not upset those findings of fact on appeal except upon a showing that the evidence, viewed in the light most favorable to the verdict, so clearly preponderated in appellant's favor that reasonable persons could not differ on the outcome of the case. *Ute-Cal Land Development Corp. v. Sather,* Utah, 605 P.2d 1240, 1245 (1980); *Nelson v. Watts,* Utah, 563 P.2d 798, 799 (1977).

The record at trial contained ample evidence from which the jury could have found either party negligent or neither party negligent.

1. A person who contracts to provide another with equipment for the purpose of performing the contracted work owes him a duty to furnish equipment reasonably safe for the use for which it is supplied, to use reasonable care to inspect the equipment to discover and remedy defects, and to inform those who are expected to use it of any such defects. *See* Restatement (Second) of Torts § 392 (1965) (expressly adopted and applied to essentially identical facts in *Reynolds v. Am. Foundry & Mach. Co.,* 121 Utah 130, 239 P.2d 209 (1952)); 41 Am. Jur.2d Independent Contractors § 30 (1968); and cases cited therein.

There was abundant evidence that polypropylene rope is commonly used in flying wire. Two construction superintendents experienced in erecting electrical towers and stringing wire testified that pilots on their projects usually used polypropylene rope, and the pilot who invented the flying method used by Groen testified that, given a choice, he always used polypropylene rope, though usually larger than ½ inch in diameter.

At the meeting between Groen, Candlish, and the Tri-O superintendent, Clinger, in the show-up yard on the first morning, Clinger informed Groen that the lead rope had been used before. However, at trial, both Groen and Clinger admitted that it was not common practice to replace the lead rope every day. Typically, such ropes are changed whenever they begin to show signs of wear or damage visible on inspection. Clinger testified that in the industry ropes are used from two weeks to eight months depending on the amount of wear they suffer. Clinger inspected the rope visually, and Groen also inspected it thoroughly hand over hand every morning before he began to fly, including the morning of the accident. Neither man found any apparent defect. Hence, there was substantial evidence from which the jury could have concluded that Tri-O was not negligent in selecting or furnishing polypropylene rope to Groen or in failing to inform him of its previous use.

The cause of the accident was also disputed. The record indicates that flying wire is inherently dangerous work that few pilots undertake for any length of time. It was undisputed at trial that snags are a common and perhaps unavoidable occurrence. Although it was uncontroverted at trial that Groen was an excellent, experienced pilot with a general reputation of competence in flying wire, there was also substantial credible evidence that he flew much faster than other pilots fly even with ideal conditions in weather, terrain, and distance between towers. Groen testified that at the time of the accident he was going approximately 25 to 30 miles per hour and that it was his practice to fly as fast as conditions permitted. Tri-O's representatives testified that they had observed other pilots fly wire between 10 and 20 miles per hour and that they had never seen any other pilot fly as fast as 30 miles per hour. The inventor of the flying method testified that threading a traveller at 18 to 20 miles per hour would have been the upper limit of safety and that it is probably the best practice to fly between 10 and 12 miles per hour, slowing down to 8 miles per hour at towers, where snags are more likely.

Plaintiffs argue that Tri-O's representatives, who observed Groen flying while in radio communication with him, were negligent in failing to warn him against flying at such high speeds with the PD–10 rope. However, Groen himself, Clinger, and Tri-O's line foreman all testified that the job was "going great" with no cause for concern right up until the accident. Moreover, all three testified that speed and technique in flying the helicopter were solely within the pilot's discretion and expertise and that as the "pilot in command," Groen was the final authority with regard to operation of the aircraft. The jury was so instructed.

The expert witnesses for both sides were in conflict on the fitness of the rope. Plaintiffs' experts testified that when new the rope had a breaking strength of 4,400 pounds and would have broken at 25 miles per hour. However, at the time Groen began using it, the rope showed signs of wear and had lost 40 percent of its breaking strength so that it could sustain only 2,600 pounds of pressure and would have broken at only 16 miles per hour. The record was clear that speeds of between 16 and 25 miles per hour are common in flying wire, and one of plaintiffs' experts opined unequivocally that the rope was not fit for its intended use. In contrast, defendant's expert testified that it was not possible to determine whether the rope was damaged before or during the accident and that because of the braided construction of the Sampson rope, it would have a greater tendency than the twisted polypropylene rope to snag and wear under the working conditions of flying wire.

As the trier of fact, the jury was entitled to give such conflicting opinions whatever weight it deemed appropriate or to reject them altogether. *Dixon v. Stewart,* Utah, 658 P.2d 591 (1982); *Foreman & Clark Corp. v. Fallon,* 3 Cal.3d 875, 479 P.2d 362, 92 Cal.Rptr. 162 (1971); *State v. Dillingham Corp.,* 60 Hawaii 393, 591 P.2d 1049 (1979); *Simpson v. Johnson,* 100 Idaho 357, 597 P.2d 600 (1979); *Boxberger v. Martin,* Okl., 552 P.2d 370 (1976); 31 Am.Jur.2d *Expert and Opinion Evidence* §§ 181, 183 (1967).

Where, as here, "there is a reasonable basis in the evidence, or from lack of evidence, upon which reasonable minds could remain unconvinced," *Centurian Corp. v. Fiberchem, Inc.,* Utah, 562 P.2d 1252, 1253 (1977), we decline to set aside the jury's finding that the proof did not preponderate in favor of defendant Tri-O's negligence. *Id.; Erickson v. Bennion,* 28 Utah 2d 371, 374–75, 503 P.2d 139, 141 (1972); *Park v. Alta Ditch & Canal Co.,* 23 Utah 2d 86, 93, 458 P.2d 625, 629 (1969).

## II.  Jury Misconduct

Plaintiffs argue that the district court erred in denying their motion for a new trial. The motion urged that the jury improperly based its verdict of no negligence on considerations of insurance extraneous to the evidence and the instructions to the jury.

In support of their motion, plaintiffs submitted affidavits of six of the eight jurors. Three of the six stated that they were confused by the wording of the special verdict, that they were unable to resolve their confusion by reading the jury instructions,

and that they based their verdict in part on their understanding and discussion that an insurance company would compensate Groen for his injuries in the amount they designated. Another juror stated that he thought insurance coverage would be provided by both parties, and two other jurors stated that insurance had been discussed by the jurors during their deliberation, but only after the question of liability was decided.

It is well settled that the only evidence admissible to impeach a jury verdict is that which demonstrates that the verdict was determined by chance or resulted from bribery. Utah R.Evid. 41; Utah R.Civ.P. 59(a)(2). All other proof as to what was said or done in the jury room, including evidence that the jury was confused or that it misunderstood or disregarded the facts or the applicable law, is inadmissible as violative of the long-standing policy against attempts to undermine the integrity of verdicts. *State v. Couch,* Utah, 635 P.2d 89, 95–96 (1981); *Stringham v. Broderick,* Utah, 529 P.2d 425, 427 (1974); *State v. Gee,* 28 Utah 2d 96, 101–02, 498 P.2d 662, 665–66 (1972); *Ostertag v. La Mont,* 9 Utah 2d 130, 135, 339 P.2d 1022, 1025 (1959).

The affidavits in this case make no statement that the verdict or any juror's assent to it was obtained by chance or induced by bribery. The affidavits were therefore inadmissible and incompetent as a basis on which to grant a motion for a new trial. The district court committed no error in denying a new trial on the basis of jury misconduct. *Johnson v. Simons,* Utah, 551 P.2d 515, 516 (1976).[2]

---

**2.** Plaintiffs also argue that the jury's finding that Tri-O was not negligent and its simultaneous finding that $212,000 would fairly compensate Groen for his injuries, taken together, are so inconsistent as to evidence jury misconduct.

On the contrary, the special verdict, standing alone, indicates that the jury did exactly as it had been charged to do. With regard to general damages, the jury was instructed: "*It will further be your duty* to determine from a preponderance of the evidence the amount of money that would fairly and adequately compen-

sate plaintiff, David L. Groen, for any injury and damage he has sustained as a proximate result of the accident in question." (Emphasis added.) A similar instruction was given the jury regarding special damages. The jury was never instructed to determine plaintiff's damages *only if* it also found that defendant Tri-O had been negligent. Moreover, the special verdict form upon which the jury entered its findings required the jury to assess the plaintiff's damages "[c]onsidering only the instructions and evidence concerning damages, and *without*

### III. Implied and Express Warranties

Plaintiffs contend that the district court erred by refusing to instruct the jury on theories of defendant Tri-O's liability under implied and express warranties of fitness pertaining to the rope.

█ A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended to relieve the promisee of any duty to ascertain the fact for himself, and it amounts to a promise to answer in damages for any injury proximately caused if the fact warranted proves untrue. *Quagliana v. Exquisite Home Builders, Inc.,* Utah, 538 P.2d 301, 309 (1975); *Welchman v. Wood,* 10 Utah 2d 325, 328, 353 P.2d 165, 167 (1960); *Hoover v. Nielson,* 20 Ariz.App. 130, 510 P.2d 760 (1973), aff'd, 110 Ariz. 329, 518 P.2d 990 (1974); *Steadman v. Turner,* 84 N.M. 738, 507 P.2d 799 (N.M.Ct.App.1973); *Metropolitan Coal Co. v. Howard,* 155 F.2d 780, 784 (2d Cir.1946).

█ A cause of action in warranty is separate from a cause of action in negligence, although this separateness does not mean that a plaintiff could recover damages on both theories. *See Cook Associates, Inc. v. Warnick,* Utah, 664 P.2d 1161 (1983). Unlike liability for negligence, which is based on fault, breach of warranty sounds in strict liability. Breach of warranty does not require that the person making the representation or promise be aware that it

is false, *Welchman v. Wood,* 10 Utah 2d at 328, 353 P.2d at 167; *Gagne v. Bertran,* 43 Cal.2d 481, 486, 275 P.2d 15, 19 (1954), and a person may be liable for breach of warranty despite his exercise of all reasonable or even all possible care. *Moore v. James,* 5 Utah 2d 91, 94–95, 297 P.2d 221, 222–23 (1956); *Chandler v. Bunick,* 279 Or. 353, 356, 569 P.2d 1037, 1039 (1977).

For the foregoing reasons, the jury's finding that defendant Tri-O was not negligent in this case does not establish that plaintiffs have no action for breach of an implied or express warranty. *Moore v. James, supra.*

Defendant contends that absent a sale or lease of goods, no warranty can arise except as an express contract term, which is absent here. It is true as a matter of history that warranties developed in the context of the commercial sale of goods.[3] However, warranties have now been recognized in circumstances other than the sale of goods. A warranty of fitness is generally implied in the lease or bailment for hire of chattels.[4] Some jurisdictions hold that one who furnishes plans and specifications for the construction of a building impliedly warrants that they are reasonably fit for that purpose.[5] Many states imply a warranty of habitability in the sale of a new home.[6] Similarly, many courts have found a warranty of workmanlike performance implicit in a contract for services.[7]

being concerned with the effect or fault of either party on damages." (Emphasis added.) The jury clearly complied with these instructions, and its compliance is no basis for granting a new trial.

**3.** *Aced v. Hobbs-Sesack Plumbing Co.,* 55 Cal.2d 573, 360 P.2d 897, 902, 12 Cal.Rptr. 257 (1961); *Gagne v. Bertran, supra;* U.C.A., 1953, §§ 70A–2–312 to –318. The contract at issue here does not involve a "sale" of "goods," and plaintiff does not rely on the statutory warranties set out in U.C.A., 1953, §§ 70A–2–312 to –318.

**4.** *Shurtleff v. Jay Tuft & Co.,* Utah, 622 P.2d 1168 (1980); *Acme Crane Rental Co. v. Ideal Cement Co.,* 14 Utah 2d 300, 303, 383 P.2d 487, 488 (1963).

**5.** *Rosell v. Silver Crest Enterprises,* 7 Ariz.App. 137, 436 P.2d 915 (1968); *Alpert v. Common-*

wealth, 357 Mass. 306, 320–21, 258 N.E.2d 755, 763–64 (1970); *Newell v. Mosley,* Tex.Civ.App., 469 S.W.2d 481, 483 (1971); *Prier v. Refrigeration Engineering Co.,* 74 Wash.2d 25, 29, 442 P.2d 621, 624 (1968).

**6.** *Petersen v. Hubschman Constr. Co.,* 76 Ill.2d 31, 27 Ill.Dec. 746, 389 N.E.2d 1154 (1979); *Theis v. Heuer,* 264 Ind. 1, 280 N.E.2d 300 (1972); *Banville v. Huckins,* Me., 407 A.2d 294 (1979); *Smith v. Old Warson Dev. Co.,* Mo., 479 S.W.2d 795 (1972); *McDonald v. Mianecki,* 79 N.J. 275, 398 A.2d 1283 (1979); *Jeanguneat v. Jackie Hames Constr. Co.,* Okl., 576 P.2d 761 (1978); *Yepsen v. Burgess,* 269 Or. 635, 525 P.2d 1019 (1974).

**7.** *Kubby v. Crescent Steel,* 105 Ariz. 459, 460, 466 P.2d 753, 754 (1970); *Hoffman v. Simplot Aviation, Inc.,* 97 Idaho 32, 539 P.2d 584 (1975); *Parsons v. Beaulieu,* Me., 429 A.2d 214, 218

Plaintiffs urge us to extend our law of *implied* warranty and hold on the facts of this case that a general contractor who supplies equipment to a subcontractor for its use in performing the contracted work impliedly warrants that the equipment is reasonably fit for the purpose for which it is supplied. However, our law does not yet reach so far, and we are not persuaded to extend it.

There is substantial evidence of an *express* warranty of fitness in this circumstance. The record is replete with defendant's representations that the rope used by Groen was strong enough for its intended purpose. On the first morning that Groen flew, he met with Clinger, Tri-O's superintendent, at the show-up yard to discuss the equipment they would be using. Groen testified that Clinger handed him the ½-inch polypropylene rope and stated that it was the kind of rope Groen would be using to pull wire. Groen had never used or seen this type of rope before. He told Clinger he had used only Sampson rope, which was of larger diameter and of different construction. Clinger responded, "Well, that's—we have used that rope; we have been using that rope. It's a good rope." Groen repeated his misgivings:

> I asked Ken [Clinger] if this rope would be strong enough because the rope that I had been using was larger in diameter and a different rope—a Sampson rope, and he said, "Oh, yes. This rope—don't worry about that rope, it's nylon or polypropylene rope and it's every bit as strong as that Sampson rope." And I thought, well, I don't know. It's not as big—you know. [Clinger responded:] "Well, new fabric kind of thing. And it is strong enough. It will be plenty strong. This rope is every bit as strong as Sampson rope." And I, still not knowing anything about ropes and not using this kind of rope before, I had nothing of my own to go on, so I was still kind of querying rather whether this would work and be strong enough. And he insisted

and said [pointing to a D–9 Caterpillar bulldozer], "That rope will lower that Cat over a cliff. It's strong enough. Don't worry about it."

Groen further testified that he knew nothing about the construction and tensile strengths of ropes generally, but that he knew only that he had always used ¾-inch Sampson rope. He asked Clinger if he could have Sampson rope anyway. Groen testified that Clinger responded:

> No. No, this rope is strong enough, you don't need Sampson rope. Besides, that Sampson rope costs a lot of money. I don't know how much Sampson rope costs per foot and we don't have it. We are going to have to send for it if we get any. We would have to send for it, which means being shut down for two or three days at least to get it. And you don't need it anyway. This rope is as strong as Sampson rope.

When Groen asked to see the actual rope he would be using to pull the line, Clinger told him that it was already set up at the job site and Groen would see it when he went there to begin work. At the job site, Groen again saw the ½-inch polypropylene rope, which was already attached to the cable on the pullers. He and Clinger inspected the rope hand over hand, looking for signs of wear. Groen again asked Clinger if he was sure the rope was going to be strong enough. Groen testified:

> And Ken [Clinger] said, "Yes. Don't worry about the rope. That rope is as strong as Sampson rope."
>
> . . . .
>
> . . . He . . . again pointed to a piece of equipment, one of the Cats, and said, "That rope will lower that Cat over a cliff." And to me that's pretty strong. And I figured that Cat was certainly heavier than a helicopter and if it would do that, it would certainly hold up for the wear and stress and so I accepted.

(1981); *Robertson Lumber Co. v. Stephen Farmers Coop. Elevator Co.,* 274 Minn. 17, 23– 24, 143 N.W.2d 622, 626 (1966).

Joe Candlish, the pilot Groen was to train, was present at both the meeting in the show-up yard and at the job site, and he corroborated Groen's testimony on this subject in every detail.[8]

■ Where, as here, there is conflicting evidence, the issues of whether Tri-O's representatives actually made the above statements and, if so, whether those statements constituted an *oral* express warranty are questions of fact that are properly submitted to the jury. *Park v. Moorman Manufacturing Co.,* 121 Utah 339, 347–48, 241 P.2d 914, 918 (1952); *Nielson v. Hermansen,* 109 Utah 180, 184, 166 P.2d 536, 538 (1946); *see generally Annot.,* 67 A.L.R.2d 619, 625–26 (1959). *Compare Morris v. Mountain States Telephone & Telegraph Co.,* Utah, 658 P.2d 1199 (1983), in which we held that the interpretation of an unambiguous *written* contract was a question of law to be decided by the judge.

■ An express warranty does not require any particular words. *Welchman v. Wood,* 10 Utah 2d at 328, 353 P.2d at 168; *Nielson v. Hermansen,* 109 Utah at 183, 166 P.2d at 537; *Rockhill v. Creer,* 56 Utah at 126, 189 P. at 671. Any direct and positive affirmation of fact, as distinguished from mere opinion or judgment, made by one party to the contract that induces the other party to act in reliance thereon constitutes an express warranty.

■ There was ample evidence that Groen understood Clinger's assurances of the rope's strength as an affirmation of

fact, that Clinger consciously intended to induce Groen's reliance, and that Groen did in fact rely. The record is also clear that Groen did, in fact, fly with the polypropylene rope in reliance on Clinger's assurances of its strength, rather than waiting for the Sampson rope which he preferred.[9] Groen testified that he knew nothing about the breaking strengths and working loads of ropes generally, but that Clinger had represented to him that he was knowledgeable about ropes, that he had been a journeyman lineman, and that he understood and read the manufacturer's literature concerning most of the ropes used to fly wire. Groen testified that he flew with the polypropylene rope that was hooked up at the job site "[b]ecause Ken Clinger said it was okay.... I was satisfied it was strong enough. Ken Clinger told me it was strong enough and that's why I used it."[10]

We conclude that there was sufficient evidence of an express warranty of fitness to entitle the plaintiffs to have that theory of liability presented to the jury. The district court erred in refusing the requested instructions on this subject.

■ The judgment for the defendant is affirmed in part (as to the causes of action for negligence and implied warranty) and reversed in part, and the case is remanded for partial new trial. At that trial, the special verdicts of the jury in the first trial that neither defendant Tri-O nor plaintiff Groen was negligent, having been sustained or not challenged on this appeal, will be res

---

8. In contrast to plaintiffs' evidence, Clinger testified that at the meeting in the show-up yard on the first morning when Groen expressed concern over the strength of the ½-inch polypropylene rope, Clinger offered to "get him anything he wanted. That I could get him a rope that he could dangle a Cat with." Clinger testified that Groen laughed at this and asked what kind of a rope that was, to which Clinger responded: "And I told him that would be a Sampson rope." Clinger further testified that Groen "said he had never heard or seen this Sampson rope. And if it was as good as I said it was, he would like to try some."

9. Q: When you asked Mr. Groen to fly with half-inch polypropylene [rope], did you know that it was not as strong as Sampson rope?

Clinger: Absolutely.
Q: When you asked him to fly with polypropylene rope, did you do so after his objections?
Clinger: Well, yes.

10. The fact that Groen inspected the rope visually before using it does not negate the existence of an express warranty since (1) the record is clear that Clinger represented himself as having superior knowledge of ropes, and he *intended that Groen rely, and Groen did in fact* rely, on this superior knowledge; and (2) it was undisputed at trial that the damage to the rope was not visible to the untrained eye.

judicata between the parties. The second trial will therefore be limited to those matters pertaining to the plaintiffs' cause of action for breach of an express warranty and the damages attendant thereon.[11]

So ordered. No costs awarded.

HALL, C.J., and STEWART and DURHAM, JJ., concur.

HOWE, Justice: (concurring).

I concur, but I believe that on the retrial the court will need to find that any express warranty made by Tri-O was supported by legal consideration. I make this observation because the alleged express warranty claimed by Groen was made by Tri-O after the contract was signed and therefore would have to be supported by new consideration. See *Zinzow Construction Co. v. Giovannoni,* 263 Wis. 185, 56 N.W.2d 782 (1953) citing Williston On Contracts, Vol. 4, pg. 2697.

11. We are mindful that the jury made a finding on the amount of plaintiffs' damages in this case. Whether such a finding should be reopened in connection with a new trial on the issue of liability depends on whether the two issues are so intermingled that fairness to both parties requires retrial on both. Cf. *Nelson v. Trujillo,* Utah, 657 P.2d 730, 735 (1982). In this case, we conclude that the retrial should involve damages as well as liability.